737 A.2d 283 (1999)
In re D.J.S.
Appeal of J.S.
Superior Court of Pennsylvania.
Submitted February 16, 1999.
Filed August 24, 1999.
*284 Ronald C. Travis, Williamsport, for appellant.
Katherine Shimer, Williamsport, for appellee.
Charles F. Greevy, III, Williamsport, for participating party.
Before STEVENS, ORIE MELVIN and BROSKY, JJ.
STEVENS, J.
¶ 1 This appeal is from the order of the Court of Common Pleas of Lycoming County which terminated Appellant J.S.'s parental rights to his daughter D.J.S. After a review of both the certified record and the briefs of the parties, we affirm.
¶ 2 The relevant facts and procedural history are as follows: D.J.S. was born to Appellant and Mother, J.S. on December 31, 1992. On February 24, 1994, Appellant was arrested in New York State on various drug possession charges and lodged in the New York State prison system from the time of his arrest until his release on April 22, 1997. On April 21, 1994, D.J.S.'s mother, who had drug addiction problems, voluntarily placed D.J.S. in foster care with the Lycoming County Children & Youth Services (CYS) where she has remained.[1] On April 28, 1994, Appellant executed a Power of Attorney appointing his Mother, H.C., as his attorney-in-fact to represent him in all proceedings pertaining to the welfare and custody of his child. On July 13, 1994, D.J.S. was adjudicated dependant and the trial court continued her placement in foster care under the supervision of CYS. CYS, by letter dated November 8, 1994, attempted to contact Father to determine his legal status and future plans. That letter went unanswered. CYS then changed the family service plan (FSP) goal from long-term foster care to that of adoption.[2] On March 23, 1995, *285 after a hearing, the FSP goal was changed to adoption. By letter dated, April 26, 1995, Appellant requested visitation with D.J.S. and volunteered to make support payments for D.J.S.'s care. For a period of one year, from when D.J.S. was placed in foster care until the court changed the FSP goal to adoption, Appellant only contacted CYS once and never spoke to D.J.S. In fact, D.J.S.'s only contact with any part of Appellant's family occurred with Appellant's mother who visited biweekly with D.J.S. until CYS changed the goal to adoption and visitation was limited to one per month. On June 16, 1996, CYS filed a petition to terminate Appellant's parental rights and on October 3, 1997, the trial court issued a decree nisi granting CYS's petition to involuntary terminate Appellant's parental rights. After Appellant's exceptions were denied, this appeal followed.
¶ 3 Appellant raises three issues on appeal: First, Appellant claims the trial court applied an incorrect standard because it should have analyzed his parenting efforts after June 16, 1996 when CYS petitioned to terminate Appellant's parental rights; second, Appellant claims the trial court erred in not accounting for Appellant's efforts as an incarcerated Father; and lastly, Appellant claims that the trial court erred in terminating his rights because it was not in D.J.S.'s best interest.
¶ 4 Appellant first claims the trial court applied an incorrect standard because it should have analyzed his parenting efforts after June 16, 1996 when CYS petitioned to terminate Appellant's parental rights. More specifically, Appellant claims that his actions after June 16, 1996 indicated that he did not wish to terminate his parental rights.
¶ 5 23 Pa.C.S.A. § 2511(a)(1) provides:
(a) General rule.The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
(b) Other considerations.The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child....
To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well-established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination. Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
In re E.D.M., 550 Pa. 595, 601, 708 A.2d 88, 91 (1998).
¶ 6 Section 2511 also requires that the parent demonstrate either a settled purpose of relinquishing parental claim to a child or refusal or failure to perform parental duties. Baby Boy A. v. Catholic Social Services, 512 Pa. 517, 517 A.2d 1244 (1986). "Accordingly, parental rights may *286 be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties." E.D.M., 550 Pa. at 602, 708 A.2d at 92.
¶ 7 CYS filed the instant petition on June 16, 1996, and, although testimony was elicited concerning Appellant and D.J.S.'s entire relationship, it is the six months immediately preceding the filing of the petition that is most critical to our analysis. See In re A.P., 692 A.2d 240 (Pa. Super.1997). However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case. Id.; See, In re K.C.W., K.O.W. and K.S.W., 456 Pa.Super. 1, 689 A.2d 294 (1997). Further, this Court in In re Hamilton, 379 Pa.Super. 274, 549 A.2d 1291, 1295 (1988) stated:
To be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.
¶ 8 It is first important to note that while the trial court focused on the six months prior to the filing of CYS's petition, it specifically stated that it was not proper to mechanically apply this standard and, in fact, examined the entire time period. Trial Court Opinion, filed, October 3, 1997, p. 11. With this in mind, we will review the findings of the trial court.
¶ 9 The record reflects that D.J.S. has been in foster care since April 21, 1994 and CYS moved to terminate Father's parental rights in June of 1996. During that time, D.J.S. did not see or speak to Appellant. In fact, the record indicates that Appellant never had direct phone contact with D.J.S. during his incarceration. While Appellant sent an occasional card or gift to D.J.S., it was not until CYS changed the goal to adoption in March of 1995, thirteen (13) months after D.J.S. was placed in foster care, that Appellant sent any regular correspondence to D.J.S. As stated supra, prior to the filing of the petition by CYS, Appellant did not contact CYS for a period of six months even though he was aware the child was in foster care. In fact, although apparently available to him, Father did not ascertain the name or address of the foster family caring for D.J.S. until March, 1995 and did not initiate any contact with the foster family or his daughter until May, 1995. Also, while Appellant showed an interest in supporting the child, he did not forward any money for support until September of 1996 after the termination petition was filed. Thus, based on the facts presented by the trial court, Appellant, for a period of six months, clearly failed to perform his parental duties.
¶ 10 Moreover, even after CYS filed its petition to terminate, the sum and substance of Appellant's attempts to contact D.J.S. were letters, some support and gifts. In fact, Appellant never followed through with attempts to have more meaningful contact with D.J.S. The trial court found, and we agree, Appellant has simply placed all of the responsibility in the hands of CYS. This approach is not proactive, and Appellant has failed to prove, under the Hamilton test, a serious intent on his part to recultivate a parent-child relationship and a willingness and capacity to undertake a parental role. Hamilton, supra. Thus, his first claim fails.
¶ 11 Next, Appellant claims that any inability to maintain a parenting role is due to his incarceration. While incarceration of a parent does not, in itself, provide grounds for the termination of parental rights a parent's responsibilities are not tolled during his incarceration. See In re Adoption of McCray, 460 Pa. 210, 331 *287 A.2d 652 (1975). Moreover, parental rights may not be preserved by waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities. See In re Smith's Adoption, 412 Pa. 501, 194 A.2d 919 (1963). "Parental duty requires that the parent not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." In re Dale A., II, 453 Pa.Super. 106, 683 A.2d 297, 302 (1996). As stated supra, the record demonstrates that Appellant failed to utilize given resources and to take an affirmative approach to fulfill his parental duties. While the record is replete with alleged inquiries by Appellant with CYS and prison officials, he has failed to follow through on these inquiries. Instead, Appellant now chooses to blame those entities for his inability to maintain contact with his daughter. In short, as the record clearly shows, Appellant has not made a good faith effort to maintain a parent-child relationship with D.J.S.
¶ 12 Appellant lastly complains that the trial court failed to inquire properly into whether termination of his rights clearly serves the needs and welfare of D.J.S.
"Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a childthe love, comfort, security, and closenessentailed in a parent-child relationship, as well as the tangible dimension." In re Matsock, 416 Pa.Super. 520, 611 A.2d 737, 747 (1992). "Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful." In re William L., 477 Pa. 322, 348, 383 A.2d 1228, 1241 (1978).
In re Bowman, 436 Pa.Super. 10, 647 A.2d 217, 219 (1994).[3]
¶ 13 With this standard in mind, we will review the findings of the trial court. The record reflects that Appellant has had no oral or face-to-face contact with D.J.S. since 1994, when she was eighteen months old. Additionally, D.J.S. has been with a family who would like to adopt her, incidentally, the same family she was placed with since the inception of her foster care. In short, it is likely that D.J.S. does not know Appellant as her parent and, in fact, is now with the only family that she has ever known. Therefore, there exists ample information to indicate that terminating the parental rights of Appellant is in D.J.S.'s best interest.
¶ 14 Based on the forgoing, we affirm the judgment of the trial court.
¶ 15 Affirmed.
¶ 16 Judge BROSKY files a Dissenting Opinion.
BROSKY, J., dissenting.
¶ 1 Undoubtedly the majority, and the trial court, believes they are doing right by the minor child by affirming the termination of the parental rights of her father who recently completed a term of incarceration for drug possession and who has a history of drug abuse. Unfortunately, it appears that they can reach this decision only by ignoring important prior precedent.
¶ 2 Initially it should be understood that the termination of parental rights is an extreme measure which should be undertaken only when the court is presented with no real option. The focus should not be upon whether the child(ren) will be better off with the foster parents than with the natural parent(s). Indeed, it has been stated by our Supreme Court that "[t]he termination by the law of a natural parent's rights to his child on the grounds of abandonment is one of the most severe steps the court can take. The finality of *288 the termination and the harsh connotations of a finding of `abandonment' carry great emotional impact on both the child and the parent. For this reason, our law has been unwilling to tell a child that he has been `abandoned' by a natural parent, and has been unwilling to label a parent as one who has `abandoned' his child unless the record clearly warrants such a finding." In Re Adoption of Sarver, 444 Pa. 507, 281 A.2d 890, 891 (1971). Due, in part, to the above, "our constitutions require clear and convincing evidence that the statute's elements exist before termination is possible." Baby Boy A. v. Catholic Social Services, 512 Pa. 517, 517 A.2d 1244 (1986).
¶ 3 The majority paints a picture of a parent who expressed no concern for his child until he was threatened with losing her and, perhaps, one who never expressed much interest in his child. I believe this is inaccurate. Prior to appellant's arrest it appears that appellant was the primary caregiver for DJS. Appellant fed, bathed and changed her during that time and, from all appearances, provided adequate care to DJS. Unfortunately, he had a drug problem which led to his arrest and incarceration. Upon learning of DJS's placement in foster care, and apparently operating under a faulty premise that CYS actually desired to return DJS to his care upon his release from prison,[4] appellant executed a power of attorney designating his mother as his attorney in fact to represent his interests with respect to DJS's placement. Considering that he was incarcerated in a neighboring state, several hundred miles from home and without an opportunity to come to Pennsylvania, and that DJS was a mere fourteen months old at the time, such actions might be construed as reasonable. Unable to rely upon his wife's efforts to interact with CYS, he entrusted that role to his mother who, from all appearances, was a concerned grandmother to DJS. Nevertheless, and contrary to the implication of the majority opinion, appellant first contacted CYS in October of 1994, prior to a change in goal to adoption and prior to the filing of a petition to terminate parental rights. Another inquiry was apparently received before March 20, 1995, as the March 20th letter from CYS acknowledges receipt of a letter from appellant.[5]
¶ 4 However, it is apparent that CYS never had a goal of caring for DJS until such time as the primary caregiving parent was capable of resuming that role.[6] Appellant was not contacted by CYS regarding DJS's placement until June 29, 1994. Due to his incarceration the original service plan focused upon DJS's mother and not appellant and had a goal of returning DJS to her mother. Yet, when the mother voluntarily terminated her parental rights CYS immediately began thinking of terminating appellant's rights and seeking a permanent placement for DJS rather than determining whether it was feasible to keep DJS in foster care until appellant was released from prison and could resume his caregiving. When appellant learned that CYS, through its change of goal to adoption, had no intention of reuniting him with DJS upon his release and was not a "friend" but rather a "foe," appellant consistently fought the goal of adoption and the termination of his rights.
*289 ¶ 5 The trial court and majority point out that appellant made no direct contact with DJS until after the goal had been changed to adoption and that appellant never made direct phone calls to DJS. However, the trial court and majority fail to acknowledge that DJS was only fourteen months old when appellant was incarcerated and that the goal was changed when DJS was a mere twenty-seven months old. The fact of the matter is that DJS was simply too young when she was separated from appellant to remember appellant for long and that she was incapable of comprehending letters from appellant during the time in question. As for making telephone calls, Appellant testified that he had a difficult time making telephone contact with CYS and DJS due to limitations on telephone usage at prison and due to his work release schedule. This fact appears to be borne out by CYS workers who testified "[w]e had several phone calls, we had a hard time. He could not call us. We had a difficult time arranging phone calls to talk to him directly. We did make some attempts to talk to differentin his different facilities to different counselors."[7] (N.T. p. 13.)
¶ 6 While it has been stated that a "parent's responsibilities are not tolled during the period of his or her incarceration," In re Adoption of Sabrina, 325 Pa.Super. 17, 472 A.2d 624 (1984), appellant's incarceration is the most distinguishing feature of this case of termination. Thus, it stands to reason appellant's conduct should be examined against other cases involving incarcerated parents. An honest review of relevant cases does not support the majority's conclusion.
¶ 7 Baby Boy A. v. Catholic Social Services, 512 Pa. 517, 517 A.2d 1244 (1986), dealt with the termination of a previously incarcerated father's parental rights. There the Supreme Court held that the lower court had properly terminated the appellant's parental rights of an incarcerated man. The Court concluded that the appellant's failure to show any interest in the life of his child constituted failure to perform parental duties. However, in that case it was concluded that there was a fifteen-month period where the appellant "did nothing to try to find out more about the child or to have any communication with the child." 517 A.2d at 1245. In accord, In re Adoption of McCray, 460 Pa. 210, 331 A.2d 652 (1975) (incarcerated father made only two actual contacts and two attempted contacts over a four-year period), and In Interest of J.E.S., 365 Pa.Super. 291, 529 A.2d 514 (1987) (during 18 month period of incarceration appellant sent two children no more than four letters, sent no cards or gifts, made no telephone calls and contacted CYS only once).
¶ 8 In contrast, where an incarcerated parent has regularly corresponded with his child and inquired about the child's welfare, the Court has found that the parent has consistently used those resources available to him to take and maintain a place of importance in the child's life. For instance, in the case of In re Adoption of M.J.H., 348 Pa.Super. 65, 501 A.2d 648 (1985), this court reversed an order terminating an incarcerated father's parental rights to his daughter. We concluded that the incarcerated father in M.J.H. had not failed to perform his parental duties even though, as here, he did not provide financial support due to a lack of financial resources and utilized family members to maintain contact with the child while he was in prison.[8] The father in M.J.H., like appellant here, directed family members to *290 buy presents for his daughter, made frequent inquiries of his family members regarding her and wrote her.
¶ 9 Similarly, in Adoption of M.T.T., 467 Pa. 88, 354 A.2d 564 (1976), our Supreme Court excused a nine month period of no contact with the child due, in part, to incarceration. Said the Court:
Appellant, in his initial contacts with children's services, demonstrated his continuing interest in maintaining a parental relationship with his son and his desire to be informed of all legal proceedings involving his son. There is no evidence whatever that appellant changed his mind after writing this letter other than his failure to contact children's services for the following nine months. ... Appellant, once he could make personal inquiries, made diligent efforts to locate his son. These factors demonstrate that appellant did not make `an affirmative indication of a positive intent' to abandon M. Rather, the record shows that he fully intended to exercise his parental rights as fully and as soon as possible.
Id., 354 A.2d at 568. The same could be said here. It is clear that appellant from the outset demonstrated both the desire and willingness to resume full parental care of DJS upon his release from prison. Although apparently the trial court and majority believe that appellant's actions were not sufficient in this regard nothing in appellant's conduct reflects a wavering from that intent to resume parental duties upon appellant's release. Further, like the appellant in M.T.T., appellant did not find CYS to be that cooperative or helpful in appellant's efforts to maintain a relationship with DJS.
¶ 10 Despite the above, the fact remains that in order to terminate appellant's parental rights under the subsection relied upon the focus must be upon the six months immediately preceding the petition to terminate. Appellant's parental rights were terminated under the auspices of 23 Pa.C.S.A. § 2511(a)(1), which reads as follows:
(b) General rule.The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
Looking at the relevant time frame appellant asserts that the court erred in granting CYS's petition to involuntarily terminate his parental rights and I must agree.
¶ 11 The court concluded that the above statutory requirements were met. The court's sentiments are neatly summarized in the following passage, "sending an occasional card to the child does not constitute regularly corresponding with the child, especially when Father failed to contact the child at all for a period of a year." Trial Ct. Op. at p. 12. Unfortunately, in my opinion, a review of the record reveals the court's assessment is inaccurate.
¶ 12 Appellant took the following measures with respect to his daughter both before and during the relevant six-month time frame:
1. Gave his mother power of attorney with respect to DJS in the belief that by doing so a concerned family member would be involved in the decision making with regard to DJS's care and welfare.
2. Directed his mother to purchase a Christmas/Birthday gift for DJS in 1994, 95 and 96, and sent DJS Christmas and/or birthday cards as well.
3. Wrote the agency in April and June of 1995 asking for the opportunity to visit with DJS and volunteering to pay support for DJS.
4. Inquired of the agency whether they could provide visitation at the jail and whether they had an obligation to assist him in establishing a relationship with DJS.
*291 5. Wrote letters and sent cards on a monthly or more frequent basis starting in March of 1995, the time when he learned who DJS's foster parents were.
6. Made numerous written inquiries to CYS regarding DJS's status.[9]
¶ 13 Limiting the review to the six months immediately preceding the filing of the petition reveals that appellant wrote at least three letters to CYS with respect to his daughter,[10] wrote at least monthly to DJS and had his mother purchase a combination Christmas/birthday present for DJS. He also sent an Easter card to DJS during this time period. Given that appellant was incarcerated and virtually indigent at the time,[11] had not been informed he could have telephone contact with DJS,[12] could not travel to Williamsport for visits and as apparently nobody was willing to take DJS to the New York prison housing appellant for face-to-face visits, I cannot conclude that appellant's conduct was so deficient as to meet the statutory requirements necessary for termination of parental rights.
¶ 14 In short, I do not find the present case analogous to J.E.S., as did the trial court, but rather more similar to M.J.H. and M.T.T. Both appellant's incarceration in New York and DJS's age were substantial barriers to appellant's maintaining a close parental relationship during appellant's incarceration. However, appellant demonstrated a desire to fulfill the parental role before, during and after his incarceration. He further took steps to maintain a parental relationship and demonstrated an interest and concern in DJS's welfare during his incarceration. Consequently, our caselaw indicates that the requirements for termination of appellant's parental rights were not met and the trial court's decision to the contrary should be reversed.
NOTES
[1] The record reflects that Mother had an admitted drug addiction and, because she was unable to care for D.J.S., she voluntarily relinquished her parental rights on October 23, 1995.
[2] The record indicates that Appellant was sent a copy of the FSP change.
[3] The record reflects that the trial court did, in fact, make this same inquiry and made it's findings which are clearly supported by the record.
[4] Appellant's misguided perception is evidenced in a letter to CYS where he states "[I]t is my understanding that your agency will help prepare Dylyn and myself for the time that we can be reunited." Letter of April 26, 1995.
[5] Contrary to the trial court's assessment, it appears that appellant's inquiry was prior to any notification of a change in goal to adoption as the letter states that CYS was enclosing the "Placement Amendment Service Plan." The proposed findings of fact filed by CYS also support this conclusion as they indicate that appellant was informed of the agency's decision to recommend termination of both parent's parental rights by letter of March 20, 1995.
[6] This intent is apparent from CYS' s directions that DJS not be read letters from appellant. Apparently CYS felt that DJS would be confused to learn "she has another father." N.T. at p. 41.
[7] In any event, one must question how agreeable CYS would have been to any efforts to make phone contact considering that they would not read appellant's letters to DJS.
[8] The father in M.J.H. also had personal visits with the child in jail. However, unlike here, the appellant was housed locally, for a period of time anyway, and had family members capable of taking the child to visit him in the state penitentiary when given state time. Here, appellant was never housed locally, but instead was housed in New York City, which is a considerable distance from Williamsport.
[9] The record establishes that appellant wrote CYS or a CYS caseworker on at least thirteen occasions during his incarceration.
[10] The first of these letters informed CYS of his current place of incarceration and inquired whether CYS had an obligation to assist him in reuniting him with his daughter. This letter evidences a clear desire to have contact with DJS. The last letter in this time frame expresses great dissatisfaction with the cooperation he was receiving from CYS in his attempts to establish a "meaningful relationship with my daughter."
[11] Obviously appellant was not earning an income at the time in question and apparently his assets were limited to approximately $7,000 which had been in a bank account at the time of his incarceration. Further, these funds were not available during the whole of his incarceration, as it appears the bank improperly paid out the money to appellant's wife. After certain litigation ensued the bank essentially replaced the money making it available to appellant in 1995. (N.T. 8/20/1997, 85, 109-10).
[12] Appellant did not have access to a phone until after 5:00 P.M., when CYS was closed. Because of this he was forced to work with a prison counselor to contact CYS on his behalf. Appellant testified that he was under the impression that his counselor at prison was attempting to establish phone contact with CYS on his behalf and that the counselor was attempting to establish phone contacts and visitations. (N.T. 8/20/97 p. 114.)