## In re G.B.S.

*Kelly S. Kline,* for Berks County Children & Youth.
*Wendie Ziegler,* guardian ad litem for minor child.
*Gary S. Fronheiser,* for Father.

SCHMEHL, P.W., *J.,* July 10, 2007—This matter came before the court on petitions filed by Berks County Children & Youth Services (BCCYS) to confirm the consent to adoption of G.M.C. (Mother) and to involuntarily terminate the parental rights of P.T.S. (Father) to the child, G.B.S, date of birth February 18, 2006. The petition to terminate Father's rights was filed on the grounds set forth in 23 Pa.C.S. §2511(a)(1), (2), (5) and (8). The court granted the petitions, and Father timely filed a notice of appeal.

Paragraph 2511(a)(1) provides that parental rights in regard to a child may be terminated on the grounds that

a "parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Paragraph (a)(2) provides that parental rights may be terminated on the grounds that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." Paragraph (a)(5) provides for termination of parental rights when a "child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child." Paragraph (a)(8) provides that parental rights may be terminated on the grounds that "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child."

A historical review reveals that BCCYS has been involved in the lives of Mother and Father since well before G.B.S.'s birth. In February 2000, Father's parental rights to a child born to Mother's sister in November 1997 were involuntarily terminated, due apparently in part to his providing that child's mother with drugs. This child was Father's fourth of seven children, having three with Mother before this child and three with Mother, including G.B.S., after this child.

In March 2006, this court terminated the parental rights of Mother and Father to G.B.S.'s five older siblings. The termination of Father's rights was by consent, Mother's rights were terminated involuntarily. The termination proceedings were brought as a result of the parents' drug abuse, lack of supervision, lack of utilities, lack of stable housing, lack of mental health treatment for the children, use of physical discipline, and their own mental health issues.

As for G.B.S., she was placed in foster care three days after her birth. Approximately three weeks prior to her birth, Mother admitted to BCCYS that she was pregnant, had no prenatal care, and used cocaine and marijuana throughout the pregnancy. At least some of the drugs were provided by Father. In a casework session on February 13, 2006, Father stated that he was not taking his prescribed mental health medication and that he felt much better, that he was not in any current treatment for mental health or drug and alcohol abuse, and that he had not used marijuana for one month. He was willing to submit to urinalysis, and three days later, two days prior to G.B.S.'s birth, he produced a urine screen that tested positive for marijuana. On February 17, 2006, Mother

went to the hospital to deliver G.B.S. and produced a urine sample that tested positive for marijuana. G.B.S. was born on February 18, 2006 and, by emergency custody order, placed in foster care on February 21, 2006.

On March 1, 2006, G.B.S. was declared dependent, and custody was transferred to BCCYS for placement purposes with a goal of return to Mother. Father was ordered to cooperate with parenting education, random urine screening, drug and alcohol and mental health evaluations and treatment, individual therapy, establishing and maintaining appropriate housing and income, casework services, and visits with the child.

During the first permanency review period of March 1, 2006 to June 6, 2006, Father left his residence to move in with friends while he was looking for his own apartment. He also changed jobs at least twice. He participated in three of three scheduled casework sessions and one unscheduled session. Father did not present himself as a resource for the child.

A drug and alcohol assessment found Father to be opioid dependent, but no treatment recommendations were made. He participated in 15 of 15 requested urine screens. Three results were positive for opiates; however, the tests were consistent with his reported use of Tylenol 3, which was prescribed for pain. His mental health evaluation led to a diagnosis of Mood Disorder, NOS and a recommendation for individual out-patient mental health sessions.

Father was offered two-hour visits with G.B.S. on a weekly basis. Father attended five of five scheduled visits through April 3, 2006. On April 10, his visits were

doubled to twice weekly. Father attended two of three scheduled visits after this change was made. The missed visit was the result of his beginning a new job. Father failed to contact the supervisor in advance that he would not be present. On May 8, 2006, visitation was transferred from BCCYS to Open Door Services to better accommodate Mother's and Father's work schedules. While Father did assist with feeding and changing G.B.S., he was observed to quickly tire of holding her and interacting with her. On one occasion, he brought a stroller that did not meet the needs of an infant. With all visits being joint between Mother and Father, Mother performed most of the childcare.

At the first permanency review hearing on June 6, 2006, Mother signed an affidavit of consent for the adoption of G.B.S. Father finally presented as a resource for the child. The court established a new goal of termination of parental rights with a concurrent goal of return to Father.

The second permanency review period ran from June 7, 2006 to November 28, 2006. Although Father previously informed BCCYS that he would have his own apartment on July 1, 2006, he continued to reside with his friends until July 31, 2006. He then resided alone in a one-bedroom apartment. He maintained the same employment through the review period.

On July 31, 2006, BCCYS received a report that Father reached up, and looked up, the skirt of a 15-year-old female member of the family with whom Father was residing. A BCCYS sexual abuse investigator issued a determination on September 28, 2006 that Father was indicated to be a perpetrator of sexual abuse by molesta-

tion, indecent assault, and pornography. The determination was based on Father's having reached up, lifted up, and looked up a child's skirt; his having grabbed her breast; and his attempt to pose and take pictures up her skirt. During the investigation, Father was not willing to participate in a sexual offender evaluation.

Father appealed the BCCYS determination, the result of which is still pending. Father also obtained a sexual abuse evaluation at his own expense on November 7, 2006. The evaluator believed that Father was making efforts to be a productive member of society, remain substance free, and be a parent to G.B.S. She believed Father should be given the opportunity to parent the child with supportive services. The evaluation was not complete, however, because the evaluator was not provided with information regarding Father's history and indicated abuse status.

During the review period, Father participated in the one and only scheduled casework session as well as two unscheduled casework sessions. He had frequent telephonic contact with the caseworker.

Father participated in 17 of 25 requested urine screens. Following the conclusion of the abuse investigation, he indicated to the caseworker there was no point continuing to participate in urine screens as a result of the investigation's conclusion that he was an abuse perpetrator.

Father successfully completed his mental health treatment on June 22, 2006. Father was offered weekly, two-hour supervised visits with G.B.S. until July 31, 2006, when visitation was terminated pending the outcome of

the sexual abuse investigation. Father attended all three scheduled visits prior to their cessation.

A second permanency review hearing was held on November 28, 2006. The primary goal remained termination of parental rights, but the concurrent goal was changed to permanent and legal custodianship.

The third permanency review period began on December 1, 2006 and extended through the date of hearing on February 9, 2007. Father continued to reside by himself in a one-bedroom apartment and maintained the same employment through the review period.

Father was offered casework services on an as needed basis. While Father continued to have frequent telephone contact with his caseworker to discuss his disagreement and frustration with the current circumstances, he requested only one casework session approximately one month after the termination petitions were filed. During the review period, he continued to refuse participation in random urinalysis and he failed to become involved in any type of offender treatment. No visitation occurred with the child due to Father's indicated status as a child sexual abuse perpetrator.

The sexual abuse evaluator resubmitted her report on December 8, 2006, after she was provided with Father's extensive history with BCCYS, including his status as an indicated perpetrator of child abuse. On review of this information, the evaluator recommended that, given Father's failure to fully disclose the reason for his evaluation referral he should submit to a polygraph regarding the incident. She further recommended that Father be given the opportunity to have contact with

G.B.S., subject to his successful completion of parenting classes; his full participation in sex offender treatment so as to recognize thinking errors, appropriate and inappropriate touch, high-risk situations, and to improve decision-making skills; and to attend scheduled supervised visits with a parenting skills worker. The evaluator believed that Father's failure to comply with these conditions should be grounds for his permanent loss of contact with the child. Father failed to comply with these conditions.

The BCCYS caseworker testified that the agency sought the termination of Father's parental rights because throughout Father's nine-year involvement with BCCYS, several significant issues that would jeopardize the child's safety and well-being remained unresolved. Despite services from three different agencies, Father continued to lack appropriate parenting skills, he refused to continue participation in random urinalysis to assure the agency that he remains drug-free, he was indicated as a perpetrator of sexual abuse of a child, and had failed to participate in any type of treatment services recommended by the sexual evaluation. Father's behavior has demonstrated an unwillingness or inability to make significant changes for the benefit of his daughter, a lack of insight, and a pattern of mental health and drug addiction difficulties. BCCYS believes that to return this one-year-old child to Father would place her at great risk. Given these circumstances and the fact that at one year of age the child does not know Father, the agency believes it is in the child's best interest to terminate parental rights and free the child for adoption.

On cross-examination, the BCCYS caseworker acknowledged that despite Father's disinterest in infant parenting programs, he was generally cooperative with services and making progress through at least May 2006. Upon the allegations of child abuse and suspension of his visits with G.B.S., Father discontinued his participation in services. The caseworker also shed more light on the fact that Father's older children were taken from him and Mother due to the parents' chronic drug abuse. The children had many problems due to their living with Mother and Father, necessitating lots of emotional support, therapy and, in one instance, even hospitalization. Even with services, Father never reached the point of being able to get his older children back. Given this set of historical circumstances and the new credible report of sexual abuse of the 15-year-old daughter of the people with whom he was living, BCCYS believed there was no reason to grant Father visitation with G.B.S. or to disturb her attachment to the foster family with which she had been since birth.

Father acknowledged that his older children have had their problems, but believed that they handled living with him well, even during his relapses, and that their problems developed after their placement. He believed the children's behavioral issues during the time that they resided with him were nothing more than sibling rivalry. He acknowledged that he had a 15-to-16-year drug problem and that he supplied Mother with drugs during her pregnancy with G.B.S.

Father acknowledged that Mother is also a drug addict, yet agreed with the goal of returning the child to Moth-

er because at the time he was just starting to get into church and his employment.

Father acknowledged failing to participate in a refresher infant parenting course because G.B.S. was becoming a toddler. He acknowledged cessation of his random urinalysis and further acknowledged that while participation would look good to the agency and the court, he believed there was no point because such participation would not allow him to visit G.B.S. He believes the only reason for BCCYS' filing the termination petition is the investigation of the sexual abuse allegation. While he could not agree to the termination of his rights pending the reinvestigation on appeal, he did agree that if the appeal is affirmed the court should terminate his rights.

"[P]arental rights may not be preserved by waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities." *In re D.J.S.,* 737 A.2d 283, 287 (Pa. Super. 1999). The long-standing law of the Commonwealth is that the inability of a parent to perform parental duties makes him or her just as parentally unfit as a parent who refuses to perform these duties. *In re B.L.W.,* 843 A.2d 380, 388 (Pa. Super. 2004). Regardless of inability or refusal, once a parent demonstrates a failure to fulfill his or her parental duties, the child's right to fulfillment of his or her potential in a permanent, healthy, safe environment with proper parenting supersedes the parent's basic constitutional right to custody and rearing of the child. *Id.* In terminating the rights of a parent, the court must give "primary consideration to the developmental, physical, and emotional needs and welfare of the child." 23 Pa.C.S. §2511(b).

Clearly grounds exist to terminate Father's parental rights to G.B.S. He has failed to perform his parental duties for well more than the six months immediately preceding the filing of the petition to terminate his rights. He has caused the child to be without essential parental care, control, and subsistence necessary for her physical and mental well-being, and has failed to participate in services to restore his right to visit with, care for, or obtain custody of the child.

While Father may have attained stability in residence and employment, the court has no way of knowing whether he has remained free of drugs due to his refusal to participate in random urinalysis, using the convenient excuse that such participation would not lead to his renewed visitation with the child. He is quick to blame others for his situation and accepts no responsibility for the conditions that led to the placement of not only this child but all of his children. Even when given the opportunity to make good on his duty to this child, G.B.S., Father was initially willing to have Mother, an acknowledged drug addict, be the return resource for G.B.S. The time for him to step up to the plate simply was not convenient.

Father's actions have spoken louder than his words. He has not been willing to do what it takes to be a parent. The court will not wait around for Father to decide to prove himself and put this child's rights to a permanent, safe environment on hold indefinitely.

Given the above circumstances and the child's attachment to her foster family, who is an adoptive resource, the court is of the opinion that termination of Father's parental rights is in the best interest of G.B.S.

For the foregoing reasons, the court entered its order of May 11, 2007 terminating Father's parental rights to the child, G.B.S.