J-S15016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF ADOPTION OF: R.S.C., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.C., FATHER | : : : : : : : : | |
| | : | No. 129 WDA 2025 |

Appeal from the Order Entered January 21, 2025
In the Court of Common Pleas of Bedford County
Orphans' Court at No(s): AD 3 for the year 2023

BEFORE: OLSON, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:                     **FILED: JULY 8, 2025**

C.C. ("Father") appeals from the order granting the petition filed by S.A.R. ("Petitioner") to involuntarily terminate Father's parental rights to his biological daughter, R.S.C. ("Child"), born in January 2017.[1]  We affirm.

We set forth, as follows, the relevant factual and procedural history from the certified record.  Approximately two months prior to Child's birth, Father was convicted of rape and received a sentence of fifteen to thirty years of incarceration.  ***See*** N.T., 1/16/25, at 27-28, 38.  When Father reaches the minimum date of his incarceration, Child will be fifteen years old.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  The same order also involuntarily terminated the parental rights of K.A.D. ("Mother").  ***See*** Order, 1/21/25, at 1-2.  Mother, who had been out of contact with Petitioner and Child for approximately seven years, did not participate in these proceedings and did not appeal the termination order.  ***See*** N.T., 1/16/25, at 11-12.

Child, at the age of three months, was removed from Mother's care by the Bedford County Children and Youth Services ("CYS" or "the Agency"). *See id*. at 11-12.[2] CYS placed Child with Petitioner when Child was three months old, and around the time Child turned one, Petitioner was awarded legal and physical custody of Child, which resulted in the Agency ending its involvement. *See id*. at 11. Child has remained in Petitioner's care since her removal.

Shortly after Child's birth, Mother and Petitioner brought Child to visit Father in-person at prison on a bi-weekly basis. *See id*. at 28. These in-person visits ceased, however, after Father was transferred to Blair County jail and then SCI-Camp Hill. *See id*. at 28-29. Since his incarceration at SCI-Camp Hill, Father attempted to contact Petitioner *via* phone once or twice a week to discuss Child's goings on, though only occasionally would Father successfully reach her. *See id*. at 29-30.

Following Child's placement with Petitioner in 2018, Father has not sent support payments for, or gifts or clothing to, Child. *See id*. at 14, 19. Up to March 2023, when the first petition was filed, and also thereafter, Father would send Petitioner letters, sometimes directed to her, asking how Child was doing, and sometimes to Child; and he would send cards for Child's birthday. *See id*. at 48. According to Petitioner, the letters were sporadic, and would

---

[2] The circumstances of Child's removal are not addressed in the certified record. Similarly, there is no information in the record regarding how Child was placed in Petitioner's care or Petitioner's relationship with Child's family.

sometimes come monthly, but then would "break up," with periods of no letters, and then the correspondence would resume. *See id*. at 48-50.

Father testified that he received $160,000 in 2022 from an insurance policy following the death of his Father, and while he gave most of it to his sister, he was unsure of her disposition of the funds. *See id*. at 32. Father additionally asserted he offered Petitioner $10,000 for Child's benefit, and Petitioner declined. *See id*. Petitioner disputed that Father had ever offered her $10,000. *See id*. at 47.

Around May 2024, Father's mother ("Paternal Grandmother") asked Petitioner to let Child stay with her, Paternal Grandmother, and Petitioner agreed. *See id*. at 45. Child's time with Paternal Grandmother began with daytime visits, and by November 2024, Child felt comfortable enough to ask to stay overnight. *See id*. at 46. Petitioner allows Child to visit Paternal Grandmother every other weekend and stay overnight on request *See id*. at 47. Child has brief telephonic contact with Father while staying with Paternal Grandmother. *See id*. at 15. Paternal Grandmother sometimes gave Child Christmas gifts, but otherwise provides no financial or other support for Child. *See id*. at 19.

As of January 2025, Child was in second grade at elementary school, and, according to Petitioner, Child regularly makes honor roll. *See id*. at 17. Child lives with Petitioner and her fiancé, as well as Petitioner's minor son from a previous relationship ("D.P."). *See id*. at 10-11. D.P. and Child maintain

contact with D.P.'s father. *See id*. at 22. Child sometimes refers to Petitioner's fiancé as "Dad," and "really looks up to him"; they play around and make crafts, and engage in various other activities including hunting and fishing and working in the garage. *See id*. at 23. Child calls Petitioner "Mom," and refers to herself as a "mommy's girl." *Id*. at 47-48. Child has no behavioral issues. *See id*. at 17. Petitioner has observed no bond between Child and Father. Child never asks Petitioner to speak with Father and never asks to see him. *See id*. at 21.

While Father opposes termination, he has no objection to Child remaining with Petitioner. *See id*. at 35. He concedes there is a strong bond between Child and Petitioner, and that he has no bond with Child. *See id*. at 42-43. Father indicates he wants to maintain telephonic contact, and establish video contact, with Child. *See id*. at 36. He does not refer to himself as Child's father during their interactions, because he is uncertain of whether she recognizes him as her dad. *See id*. at 36-37. Additionally, Father concedes he does not know if he will be released at his minimum incarceration date. *See id*. at 38. He asserts that he asked Petitioner for video visits with Child, but, while she did not expressly refuse, she took no action, *see id*. at 30;

however, Father thereafter did not follow-up or take any further action to attempt to establish video visitation. *See id*. at 39.[3]

In March 2023, Petitioner filed a petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). In August 2023, Petitioner filed an amended termination petition asserting, *inter alia*, identical grounds for termination of Father's parental rights.[4] In November 2023, Petitioner filed a second amended termination petition.[5]

_____

[3] Around January 2024, Petitioner changed her phone number and asked Paternal Grandmother not to share the number with Father because he had become "very mean" and "disrespectful" toward her. *See* N.T., 1/16/25, at 20. Petitioner further explained that she disapproved of phone contact with Father because Child told her that Father had said he was going to be released from prison soon and he would take custody of her, which scared Child. *See id*. at 21. Father denied he ever said such a thing. *See id*. at 40. In any event, as noted above, Petitioner did not attempt to prevent Paternal Grandmother from making Child accessible to Father during Child's visits with Paternal Grandmother. *Accord id*. at 34 (Father stating that he had spoken to Child in early January 2025 on the phone when she was at Paternal Grandmother's residence).

[4] On August 22, 2023, the trial court appointed Matthew R. Dombrosky, Esquire ("Attorney Dombrosky"), as Child's legal counsel and guardian *ad litem* ("GAL"). *See* Rule Returnable, 8/22/23, at 1 (unpaginated); N.T., 1/16/25, at 5-9. The trial court expressly determined that there was no conflict between Child's best and legal interests that would preclude Attorney Dombrosky from serving in this role. *See* N.T., 1/16/25, at 5-9. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020); 23 Pa.C.S.A. 2313(a).

[5] Father has not contested Petitioner's standing to petition for the termination of his parental rights pursuant to 23 Pa.C.S.A. § 2512(a)(3). *Cf*. *In re Adoption of Z.S.H.G.*, 34 A.3d 1283, 1289-90 (Pa. Super. 2011) (challenges to a petitioner's standing are waivable). We are thus precluded from raising it *sua sponte*.

Throughout these filings, Petitioner has solely sought termination pursuant to section 2511(a)(1) and (b). **See** Second Amended Petition, 11/1/23, at ¶¶ 12-13; Amended Petition for Involuntary Termination, 8/21/23, at ¶¶ 10-11; Petition for Involuntary Termination, 3/2/23, at ¶¶ 9-10.

The trial court held a termination hearing on January 16, 2025, wherein Petitioner and Father each testified.[6] Child's counsel/GAL also placed Child's position on the record; he explained that she was an "energetic, talkative child" who "offered a lot of information to me without me asking. Intelligent child. She's on distinguished honor roll." N.T., 1/16/25, at 7. Attorney Dombrosky explained that Child refers to Petitioner as "mom," and noted that Child refers to Petitioner's former partner as "Dad," but also sometimes calls Petitioner's fiancé "dad." **Id**. Attorney Dombrosky noted that Child, unprompted, told him her "actual mom and dad's names," as well as other of Father's family members. **Id**. When asked where she would want to live if she could live anywhere in the world, she said "I would still want to live with this family . . .." **Id**. at 7-8. Child felt "very good" about being adopted by Petitioner, and when asked how she would feel if she were to live with Mother or Father, "[h]er demeanor changed. She became quiet and she said, ['S]ad.[']" **Id**. at 8.

---

[6] Father was represented by counsel and appeared via video.

At the conclusion of the hearing, the court granted the petition, pursuant to section 2511(a)(1) and (b) and involuntarily terminated Father's parental rights.  Father timely filed both a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).[7]

Father raises the following issues for our review:

I.    . . . [D]id the trial court commit an abuse of discretion or an error of law in determining that [Petitioner] presented sufficient evidence to satisfy her burden of proof by clear and convincing evidence that [Father] evidenced a settled purpose of relinquishing parental claim to the child, or has refused or failed to perform parental duties for a period of six (6) months prior to the filing of the petition for involuntary termination of parental rights?

II.   . . . [D]id the trial court commit an abuse of discretion or an error of law in determining that [Petitioner] presented sufficient evidence to satisfy her burden of proof by clear and convincing evidence that the child's best interests would be promoted *vis-a-vis* her developmental, physical and emotional needs with the termination of his parental rights?

Father's Br. at 7-8.

Our standard of review is for an error of law or abuse of discretion: "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." ***In re Adoption of L.A.K.***, 265 A.3d

---

[7] The trial court filed a statement pursuant to Rule 1925(a)(2)(ii) referring to its on-the-record statements at the conclusion of the termination hearing. ***See*** Trial Ct. Op., 2/6/25.

580, 591 (Pa. 2021).[8]  Thus, we must consider whether the trial court's order is supported by competent evidence.  *See In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).  Appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  *See Interest of S.K.L.R.*, 256 A.3d at 1123.

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings.  *See* 23 Pa.C.S.A. §§ 2101-2938.  Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b).  *See id*. § 2511(b).

Section 2511(a) provides, in relevant part, as follows:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing

---

[8] "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result."  *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will."  *Id*.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.  *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123-24 (Pa. 2021).

parental claim to a child or has refused or failed to perform parental duties.

. . . .

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

For purposes of subsection (a)(1),

[a] parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. This [C]ourt has repeatedly recognized that parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs.

*In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) (internal citation, ellipses, and quotations omitted). A parent cannot protect his parental rights by merely stating that he does not wish to have his parental rights terminated. *See id*. at 464. Thus, even where a child's custodial parent, or others, place obstacles to maintaining a party's contact with the child, that party must show some "reasonable firmness" in attempting to overcome those obstacles. *See id*. Grounds arise for termination where the parent demonstrates a failure to

take an active role in attempting to form a parental relationship with his child. *In re E.S.M.*, 622 A.2d 388, 394 (Pa. Super. 1993).

Father argues the trial court erred in finding grounds for termination pursuant to section 2511(a)(1) because he evinced a "settled intent to maintain a parent-child bond . . . notwithstanding his incarceration." Father's Br. at 18. He points to the visitation with Child when she was an infant, his phone and mail contact with Child, and his offer of $10,000 of financial support to Petitioner for Child's benefit. *See id*. at 17-18. He also points to his request to Petitioner that she set up video visits for him and Child. *See id*. at 18.

Ultimately, the trial court found termination under section 2511(a)(1) was warranted due to Father's failure, since Child's birth, to perform any parental duties. The court reasoned:

> . . . [S]ince . . . [C]hild has been about three months old, until the time the petition was filed, I would note that . . . [F]ather . . . has really had no, what I would call, in-person contact due to his incarceration. There's been some occasional letters and a birthday card every year. And then, more recently, within the last year . . . there were telephone calls when . . . [C]hild is at [Paternal Grandmother's residence.]
>
> * * * *
>
> . . . [E]ven if I were to consider those telephone calls, I still think that . . . [P]etitioner, as it relates to section [2511](a)(1), has met the burden of proof. Simply because, well, I guess some of this, when you look at what a young child needs for all these years . . .. Every single one of those things has been done by the [P]etitioner. Has not been done by . . . [F]ather. That would be well in excess of the six months, contemplated under the statute. So I do find . . . [P]etitioner has met that section by clear and convincing evidence.

- 10 -

N.T., 1/16/25, at 62-63.

Based on our review, we conclude the trial court committed no error of law or abuse of discretion in finding grounds for termination of Father's parental rights under section 2511(a)(1) based on a failure to perform parental duties, namely, his failure to exercise reasonable firmness to actively cultivate a parent-child relationship. While incarceration alone does not provide grounds for termination of parental rights, "a parent's responsibilities are not tolled during his incarceration." *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999). A parent must take a "proactive" approach to establishing meaningful contact with a child that evinces a "serious intent on his part to []cultivate a parent-child relationship and a willingness and capacity to undertake a parental role." *Id*. Parental duty "requires that the parent not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id*. at 287 (internal citations and quotations omitted). The record shows that since his incarceration, Father has had a few in-person visits with Child when she was a baby, and thereafter only sporadic contact via phone and through the mail.

We note that Father testified he could have established video visitation with Child at SCI-Camp Hill, yet, apart from asking Petitioner apparently a single time via letter, and his own sister, to set up video visits with Child, he has taken no other steps to facilitate them. *See* N.T., 1/16/25 at 30, 39; *see*

*also In re C.M.S.*, 832 A.2d at 462 (a parent must exercise reasonable firmness in resisting obstacles to maintaining a parent-child relationship). Additionally, the court apparently did not credit Father's testimony about the $10,000 he offered Petitioner after his father's death in 2022. *See* N.T., 1/16/25, at 63 (trial court concluding Father has contributed no financial support for Child). This Court may not disregard the trial court's credibility determinations, as the record supports them. *See Interest of S.K.L.R.*, 256 A.3d at 1123. Indeed, Father has not shown he was proactive in cultivating a parent-child relationship "and a willingness and capacity to undertake a parental role." *D.J.S.*, 737 A.2d at 286. Because Father failed to consistently perform any parental duties for Child since she was a baby, including exercising reasonable firmness in establishing video visitation, which he knew to be an option, we cannot conclude the trial court abused its discretion, or committed an error of law, in finding grounds for termination under subsection 2511(a)(1) based on Father's repeated failure to perform parental duties. *Accord D.J.S.*, 737 A.2d at 287 (an incarcerated parent's inquires of others, without following through on the inquiries, does not rise to the level of a good-faith effort to maintain a parent-child relationship); *See also In re B., N.M.*, 856 A.2d 847, 859 (Pa. Super. 2004) (finding grounds for termination under subsection 2511(a)(1) where there was "little indication in the record of a proactive desire to take on the role of a parent in Child's life").

We turn next to the trial court's determination that termination of Father's parental rights to Child was in her best interests pursuant to section 2511(b). Section 2511(b) gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). **See also In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). We remain mindful that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." **Interest of K.T.**, 296 A.3d 1085, 1105-06 (Pa. 2023). This inquiry is neither formulaic, nor mechanical. **See id**. Our Supreme Court has elaborated:

> . . . [T]he child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

**Interest of K.T.**, 296 A.3d at 1106 (internal citations, quotations, and footnotes omitted). Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the [s]ection 2511(b) analysis." **Id**. at 1109. In considering the affection which a child may have for his or her natural parents, this Court has stated that the affection a child harbors for parents does not necessarily constitute a bond, nor is a biological connection sufficient to establish that a bond exists. **See In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa. Super. 2008). Further, this Court has clarified that it is "within the discretion

of the [trial] court to prioritize the safety and security" of children "over their bonds with their parents[.]" ***Interest of M.E.***, 283 A.3d 820, 839 (Pa. Super. 2022). Thus, we will not disturb such an assessment if the trial court's factual findings are supported by the record. ***See id***.

Father argues termination of his parental rights was not in the Child's best interests. Father asserts that "granting the termination in favor of the anticipated adoption creates a one-parent child situation, which cannot be in . . . [C]hild's best interests." Father's Br. at 21.[9]

In concluding that Child's developmental, physical and emotional needs and welfare supported termination of Father's parental rights, the trial court found that there was no bond with Father and that Child was thriving with Petitioner:

> . . . [C]hild refers to [Father] as [C.C.] And actually, I applaud him for not insisting to . . . [C]hild that she call him dad.
>
> I'm sure he would have liked that. . . . But I think he refrained from doing that because he had the best interest of [C]hild in mind. He acknowledged and understood that he didn't know what . . . [C]hild was told about him and he knew that . . . [C]hild referred to [Petitioner's former partner] as father and looked at him as a father figure[,] and he didn't want to confuse the child . . ..
>
> . . . [T]his may be a different case if [C]hild [had been[ seven or eight [] years old when he went into jail and they had a bond to

---

[9] While Father's two-page argument is arguably undeveloped and accordingly waived, ***see In re M.Z.T.M.W.***, 163 A.3d 462, 466 (Pa. Super. 2017) (concluding that section 2511(b) challenges are waivable), because we apprehend the essence of his general argument, our review is not impeded, and we decline to find waiver.

begin with . . ., but that's not the facts of this case. There was never the bond to begin with. . . ..

＊ ＊ ＊ ＊

So it would seem to me that since . . . [P]etitioner has had . . . [C]hild, she has met all of her needs. It sounds as though she's a very intelligent, articulate, delightful child. She does very well in school. It seems to me[] she's doing quite well right now.

So, I believe that it's in . . . [C]hild's best interest to terminate the parental rights as it relates to . . . [Father].

N.T., 1/16/25, at 64-67.

Following our review, we conclude the trial court's finding that termination of Father's parental rights was in Child's best interest was supported by the record and law. Father does not dispute the trial court's finding that he has no bond with Child, nor the court's finding that Child is thriving with Petitioner, whom she looks to as her mother, and who provides Child with stability, permanence, and looks after her developmental, physical, and emotional needs and welfare. *See*, *e.g.*, *K.T.*, 296 A.3d at 1105-06. Father cites no authority in support of his claim that a "one-parent" situation is necessarily not in a child's best interest, and we have uncovered none. Accordingly, we discern no abuse of discretion in the trial court's determination that termination of Father's parental rights was in Child's best interest.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: <u>07/08/2025</u>