J-S87004-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.L.E.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.S.H., FATHER | No. 1296 MDA 2016 |

Appeal from the Decree July 8, 2016
in the Court of Common Pleas of Schuylkill County
Orphans' Court at No: A63-126B-16

BEFORE: LAZARUS, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED JANUARY 06, 2017**

Appellant, A.S.H. (Father), appeals the decree of the Orphans' Court Division of the Court of Common Pleas of Schuylkill County, entered July 8, 2016, that terminated his parental rights to his son, S.L.E.H. (Child), born in February 2011. We affirm the decree on the basis of the trial court opinion.

In its opinion, entered July 8, 2016, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. (**See** Trial Court Opinion, 7/08/16, at 3-8). Therefore, we have no reason to restate them at length here.

For the convenience of the reader, we note briefly that T.L.E. (Mother) and Father lived together with Child until Child was five months old, at which

_____

[*] Retired Senior Judge assigned to the Superior Court.

point Mother obtained a Protection From Abuse (PFA) order and Father left the residence. Mother filed for, and was granted, primary custody. Father was given partial custody, with three supervised two-hour visits with Child each week. After the first supervisor refused to continue overseeing the visits, Catholic Charities Agency volunteered to supervise them. Father attended one visit supervised by Catholic Charities Agency; however, because of his behavior, they too refused to continue supervising. Father has not seen, nor made any attempt to see Child, since September 4, 2012. On March 16, 2016, Mother and W.A.S. (Stepfather), filed a petition to terminate Father's parental rights to Child. The trial court held a hearing on that petition on June 27, 2016. It entered its decrees terminating Father's parental rights, pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b), on July 8, 2016. Father's timely appeal followed on August 5, 2016.[1]

Father raises the following questions on appeal:

1. Did the trial court err and commit an abuse of discretion when it determined that [] Father failed or refused to perform parental duties for the [] [C]hild?

2. Did the trial court err and commit an abuse of discretion when it determined that the [C]hild's best interests, needs, and welfare were best served by terminating [] [F]ather's parental rights?

_____

[1] Father timely filed his notice of appeal and statement of errors complained of on appeal on August 5, 2016. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court entered its opinion on August 9, 2016, in which it relied on the reasoning set forth in its July 8, 2016 opinion. *See* Pa.R.A.P. 1925(a)(2)(ii).

(Father's Brief, at 4).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b). Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> \* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted). Further,

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. . . .

- 4 -

***In the Interest of K.Z.S.***, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, we conclude that there is no merit to the issues Father has raised on appeal. The trial court opinion properly disposes of the questions presented. (***See*** Trial Ct. Op., 7/08/16, at 8-9 (finding that (1) Father last had contact with Child in 2012, and never acted to overcome any obstacles that his own actions put in way of seeing Child, (2) Father had settled purpose of relinquishing his parental rights, and (3) termination of Father's parental rights is in best interest, needs, and welfare of Child)). Accordingly, we affirm on the basis of the trial court's opinion.

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>1/6/2017</u>

COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

In Re:                                    |  No. A63-126B-16
S████ L██ E███████ H██████,              |
            a Minor      |
                                          |  Contested Involuntary Termination
                                          |

Counsel of Record: Michael Beltrami, Esquire – for Petitioner
                          Julie A. Werdt, Esquire – for the Natural Father
                          Nicholas J. Watt, Esquire – for the Minor Child

## OPINION OF COURT

BALDWIN, P.J.

T████ L██ E███████ (hereinafter E███████), the natural mother, and W█████ A████ S████, her husband, filed a petition to involuntarily terminate the parental rights of A███████ S███ H████ (hereinafter H████), the natural father of S███ L██ E███████ H████ (hereinafter S████). S████ was born on February █, 2011.

The termination of parental rights is governed by statute. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies at least one of the nine statutory grounds delineated in Section 2511(a) of the Pennsylvania Adoption Act, 23 Pa.C.S.A. §2101 *et seq*. See also *In re I.J., 972 A.2d 5, 9 (Pa.Super. 2009)*. If the court determines that the parent's conduct warrants termination, it must then engage in an analysis of the best interests of the child pursuant to Section 2511(b) and take into consideration the developmental, physical, and emotional needs of the child. The best interests of the child may not be separately considered until a finding has been made that the statutory requirements for termination have been met. *In re Adoption of M.R.B., 25 A.3d 1247 (Pa.Super. 2011)*.

In this case, petitioners sought the involuntary termination of Hosier's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1) and §2511(b) which provide as follows:

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of

relinquishing parental claim to a child or has refused or failed to perform parental duties. **23 Pa. C.S.A. § 2511(a)(1).**

and

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child . . . . **23 Pa. C.S.A. § 2511(b).**

Parental rights may be terminated if, for a period of at least six months, a parent either demonstrates a settled purpose of relinquishing a parental claim to a child or refuses or fails to perform parental duties. *In re Adoption of R.J.S., 901 A.2d 502, 510 (Pa.Super. 2006)* (citing *In the Matter of the Adoption of J.M.M., 782 A.2d 1024, 1030 (Pa.Super. 2001), appeal denied, 797 A.2d 914 (Pa. 2002).* The parental duties required by the language of Section 2511(a)(1) have been defined as "many sided." *In re Adoption of M.J.H., 501 A.2d 648, 652 (Pa.Super. 1985), appeal denied, 522 A.2d 1105 (Pa. 1987).* Not only is there a duty to love, to protect, and to support one's child, there is also a duty to maintain communication and association with that child. **Id.** Further, being a parent is more than a passive state of mind, it is "an active occupation, calling for constant affirmative demonstration" of love, protection, and concern. **Id.** A parent must "exert himself to take and maintain a place of importance in the child's life." **Id.** (Citations omitted). Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life. *In re C.M.S., 832 A.2d 457, 462 (Pa.Super. 2003)* (citation omitted), *appeal denied, 859 A.2d 767 (Pa. 2004).* Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. *In re D.J.S., 737 A.2d 283 (Pa.Super. 1999).*

The failure or refusal to perform parental duties should be measured "in light of what would be expected of an individual in similar circumstances" to the parent under examination. *Lookabill v. Moreland, 485 A.2d at 1204, 1206 (Pa.Super. 1984).* The

2

totality of the circumstances surrounding the parent's failure to perform parental duties must be considered, including the effect of certain barriers on the contact between the parent and the child. *In re Z.P., 994 A.2d 1108 (Pa.Super. 2010)*.

A child needs love, protection, guidance and support, and these physical and emotional needs cannot be met by a merely passive interest in the development of the child by the natural parent. *In re Shives, 525 A.2d 801 (Pa.Super. 1987)*. The satisfaction of these needs requires the natural parent's affirmative performance, including a genuine effort to maintain communication and association with the child. **Id.** As we have repeatedly acknowledged, a "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re I.J.*, *supra*. A parent who cannot, or will not, meet the minimum requirements of care within a reasonable time may properly be considered unfit and have his parental rights terminated. *In re Z.P.*, *supra*.

E████ testified that she and H████ lived together when S██ was born, but separated when S██ was about five months old due to H████ tendency for violent behavior, fits of rage, physical abuse, and his controlling nature. She described an event that took place in early August of 2011 when she returned to the home from her mother's house. She said that H████ began arguing with her and grabbed S██ from her arms. She begged him to give the baby back to her, which he finally did, and she got into her car to leave. H████ again "started freaking out." [N.T., p. 7]. After a series of scuffles and verbal arguments, E████ managed to drive away from the home and went directly to obtain a Protection From Abuse (PFA) order against H████. The couple never lived together again after this event.

On August 17, 2011, a final PFA order was entered which protected E████ until February 17, 2013. Pursuant to the PFA, H████ contact with S██ was limited to supervised visitation by H████ father, B████ H████, in his father's home, with three two hour visits per week. All arrangements were to be made between E████ and

3

H████s father. The PFA also directed H████ to follow-up with any mental health treatment as recommended and to continue with such treatment until he was successfully discharged. He was also directed to sign any necessary releases.

As required pursuant to the PFA, E████ filed for custody of S██ within thirty days of the entry of the order and a conference was held. At the conference, an agreement was reached between the parties that gave primary physical custody to E████ and supervised partial physical custody to H███ on Fridays, Saturdays, and Sundays for a few hours, with B████ H███ supervising those visits. A custody stipulation was presented to the court and made an order of court on September 21, 2011.

In April 2012, a modification of the custody order was pursued because B████ H███ was no longer willing to supervise the visits. A conference was held on July 9, 2012, at which time the parties could not reach an agreement. A new interim order was entered on July 11, 2012, which kept the same custody scheme, but changed the visits to the Catholic Charities Agency, who were willing to supervise the visits. H███ made one visit with S██ at the Agency's office, but the second visit was cancelled due to H███ behavior at the office when he arrived.

The Catholic Charities Agency, by correspondence to the Custody Conciliation office dated August 23, 2012, decided to discontinue supervising H████s visits with S██ due to his "labile" behavior and his inability to control his actions. [N.T., p. 12]. A custody conference was held, and after a discussion with the parties, their respective counsel, and the custody conciliation officer, it was agreed that H████ custody rights would be suspended until he accomplished certain things. The court order dated September 4, 2012, provided that H███ was to immediately contact Service Access and Management, arrange for an intake evaluation, submit to the psychiatric evaluation, follow all recommended treatment or medications, and execute all consents necessary to release the information to the Custody Conciliation Office and to both counsel.

4

H██████ never completed the psychiatric evaluation and he never saw S████ after September 4, 2012. He did contact E███████ once in 2014 asking to see S████, but has not made any attempts since then, has not filed any request to modify the custody order, and has never provided anyone with proof that he completed a mental health evaluation or treatment.

E███████ testified that she has resided at the same address where she and H██████ lived from August 2012 until December 2015, and that H██████ had never visited the home. She testified that she still has the same telephone number she had when S████ was born and that H██████ knew the number. She also testified that she never received any letters or gifts from H██████ for S████. H██████ was ordered in June of 2012 to pay child support for S████, but sometime in 2014, Carbon County dropped the support requirement and the arrears because it learned that H██████ was seeking governmental disability benefits. E███████ testified that the last time H██████ saw S████ was September 4, 2012, and other than contacting her once in 2014, he has not made any effort to visit with S████. She also testified that B██████ H██████ has maintained a relationship with S████, and has visited with him on a frequent basis as well as giving S████ gifts for special occasions. We find that E███████ testified credibly.

In contrast, H██████ first testified that he had not seen S████ since September 4, 2012, but that was because he did not know where E███████ lived. Later, he blamed his failure to see S████ on the PFA, stating that he was "trying not to get in trouble anymore." [N.T., p. 44]. H██████ said that he had not been abusive to E███████, and had only agreed to the PFA because his "lawyer said to agree with everything." [N.T., p. 29]. He testified that his violent actions might have been only as a result of a pinched nerve.

H██████ estimated that he telephoned E███████ at least a dozen times from September 2012 through the date of the hearing, but that not one of his calls was ever returned. H██████ testified that he had tried to maintain a relationship with S████ through

5

telephone calls, but he did not get any phone calls back, and he believed that E██████ was keeping him from a relationship with S██.

He testified that he had sent many gifts for S██, but because he was unsure where E███████ was residing the gifts he sent "got returned." [N.T., p. 35]. When pressed about what kind of gifts he sent and when, he replied that he sent "kid stuff" and toys, and that they were sent "from the time he was born, well after the time we separated" in 2012. [N.T., p. 36].

H████ stated that his father stopped supervising the custody visits only because H████ stopped doing the hard physical work that his father required him to do when visits with S██ took place. H████ did not like that B████ H████ often told him "how to raise a child" when he never raised his own kids. [N.T., p. 31]. H████ admitted that he knew his father was seeing S██ on a regular basis, but his father was "noted as a liar as well." [N.T., p. 45].

Hosier t█████ that there was an incident when he picked up S██ and S██ had black and blue marks on his back and bottom. H████ reported that Schuylkill County Children and Youth Agency was contacted, but that they "opened and closed the case in two weeks." [N.T., p. 31]. H████ admitted that the Children and Youth investigation resulted in a finding of "unfounded", but he stated that it "seemed a little strange" in his book. [N.T., p. 43]. He was very concerned that E███████ was never arrested and the Agency closed the case so quickly that the incident caused him to go "into a downward spiral" believing that E███████ was abusing S██. [N.T., p. 32]. However, he did not pursue those concerns further, nor did he file for a modification of custody because "things cost money" and he was "fighting for disability." [N.T., p. 32].

H████ testified that the Catholic Charities Agency stopped supervising his visits and "dishonored" him only because he was pushing "Daddy" too much on his son by calling him "Daddy's little man." [N.T., p. 32, 33]. He denied acting irrationally at the

6

office when he arrived for his visit and asserted that they had "yanked" S███ away from him which made him angry. [N.T., p. 44].

With regard to his mental health evaluation and treatment, H████ testified that he did not go to Service Access and Management, but went to New Beginnings in September 2012, where he underwent a psychiatric evaluation and a number of therapy sessions. He was not placed on any medications and recalled signing a release so that the court could get that information. H████ testified that he was diagnosed as free of any mental health effects and had paperwork to show that, but he had "misplaced" the paperwork. [N.T., p. 46]. He stated that his counselor told him that he would be willing to come to court if he was needed, and that the counselor had "wrote high, high recommendations on everything" about him. [N.T., p. 46]. H████ also remembered that the court "wrote up a piece of paper" in response to his mental health records which said that there was "no harm, no foul" and he should have full custody of S███. [N.T., p. 34]. H████ agreed that he had never presented anyone with paperwork confirming that he had submitted to an evaluation, or diagnosed as not in need of treatment. He also admitted that any mental health treatment he may have pursued ended in 2012.

H████ was incarcerated in the Schuylkill County Prison from March 2016 through June 2016 on a "bowl and weed charge." [N.T., p. 38].

H████ admitted that he had not provided any child support for S███ since August 2012. [N.T., p. 41]. He testified that he was never really able to provide for S███ and that it was "pretty rough" because "of trying to survive off of what they give me." [N.T., p. 38]. He is currently receiving $730 a month which he said was from "Supplemental." [N.T., p. 38]. He stated that he believed that S███ was eligible for a check under his name, and that S███ is not receiving the benefits because E████ refused to contact the Social Security Office. However, S███ is not eligible to receive a benefit as a dependent in the program under which H████ claims to be receiving benefits.

7

Finally, H███ disagreed that his parental rights should be terminated and asserted that he did want a relationship with S██. He stated that when he had seen S██ in 2012, he would "jump out the window right into [his] arms." [N.T., p. 37]. H███ opined that although S██ was only months old at that time, S██ knew it was him coming to pick him up and that he would know it was him even if coming "through a traffic jam." [N.T., p. 37]. He blamed E█████ for preventing him from seeing S██ because she would not return his phone calls and would not accept the gifts that he sent for S██. H███ admitted that he had no relationship or bond with S██ and knew nothing about him. [N.T., p. 41].

Although H███ testified that he did not want his parental rights terminated, it is difficult to find that he has not had a settled purpose of relinquishing those rights. His last contact with S██ was in 2012 and he has never acted to overcome any of the "obstacles" that his own actions put in the way of his seeing his son. H███ has not acted to maintain a relationship with S██ that was severed when S██ was only a little over a year old. He blames E█████ for obstructing his contact, yet the evidence establishes that she resided in the same home until December 2015, kept the same telephone number, and retained contact with H█████ father. We find that clear and convincing evidence establishes that H███ had a settled purpose of relinquishing his parental rights.

In deciding the sensitive question of the involuntary termination of parental rights, we are mindful of the irreversible nature and the serious emotional impact which necessarily follow such an action. *In re Adoption of Ostrowski*, 471 A.2d 541 (Pa.Super. 1984). It is well-established that the court must engage in a bifurcated process in terminating parental rights. *In re D.W.*, 856 A.2d 1231 (Pa.Super. 2004). Initially, the court must focus on the conduct of the parent, and only after determining that the parent's conduct warrants the termination of parental rights does the court engage in the second part of the analysis, that is, determining the needs and welfare of

8

the child under the standard of the best interests of the child. *In re C.L.G.*, *56 A.2d 999 (Pa.Super. 2008)*. A major aspect of the needs and welfare analysis concerns the "nature and status of the emotional bond between parent and child." *In re Adoption of R.J.S.*, *supra.* at 509 (citing *In re C.M.S.*, *884 A.2d 1284, 1287 (Pa.Super. 2005))*. We must be careful not to destroy something necessary and beneficial to the child. *In re Z.P.*, *supra.*

S████ has resided with E████████ since his birth. He is five years old and is doing well. S███ does have some discipline problems which are being addressed and have improved. E████████ and her husband attended classes to learn how to help S███ improve his focusing and his ability to stay calm, and how to control his emotions. S███ enjoys playing with Legos, watching movies and taking nature hikes. His daily needs have been taken care of by E████████ since his birth and by W████ A████ S████ since he and E████████ became a couple about a year and half ago and married in December 2015. There is a good relationship between S███ and his stepfather. W████ S███ is interested in adopting S███.

We conclude that there is no evidence showing that the minor child's needs and welfare are better served by continuing A████████ S███ H██████ parental rights. Instead, the termination of the parental rights of the natural father, A████████ S███ H████, is in the best interest, needs, and welfare of the minor child, S███ L██ E████████ H████.

Accordingly, we enter the following:

9