J-A23013-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF: D.C. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.C.C., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 682 MDA 2021 |

Appeal from the Decree Entered May 11, 2021
In the Court of Common Pleas of Lebanon County
Orphans' Court at No. 2020-00693

BEFORE:   BENDER, P.J.E.,  MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:                **FILED OCTOBER 01, 2021**

A.C.C. JR. (Father) appeals from the decree terminating his parental rights to D.C. (Child).  After careful review, we affirm.

Child was born in June of 2010.  At the time of the termination hearing, she was almost 11 years old and had been in the care of Children & Youth Services (CYS) for 35 months.  N.T., 5/11/21, at 24.  The orphans' court detailed the case history, beginning at the time of Child's eighth birthday, as follows:

> [CYS] became involved through a referral in June of 2018.  **The Minor Child was living with Mother at that time and has had minimal contact with Father since birth. According to Father's testimony, he last saw the Minor Child in 2013**.  In 2018 Mother developed limited mobility and verbalization due to what was then believed to be Huntington's Disease, but has since been diagnosed as early-onset Alzheimer's.  The home was found to be in an unsanitary and deplorable condition, with the Minor

---
[*] Former Justice specially assigned to the Superior Court.

Child brought home by police a number of times after being found alone on the streets unsupervised. The juvenile court [] granted CYS emergency custody on June 15, 2018 pending a Dependency Hearing. CYS filed a Dependency Petition on June 18, 2018.

The juvenile court [] found the Minor Child dependent on August 6, 2018 on the grounds that the child was without proper parental care or control. At that time, the placement goal for the Minor Child was to return to parent, with a concurrent permanency plan of adoption. At the Review Hearing on March 19, 2019, the juvenile court found that there had been moderate compliance with the permanency plan as to Mother and no compliance with the permanency plan as to Father. At the March 19, 2019 Review Hearing, the juvenile court found Mother had made substantial progress toward alleviating the circumstances which had necessitated the original placement. Return to parent remained the goal of the permanency plan, with a concurrent goal of adoption. At the Review Hearing on May 20, 2020 the juvenile court found that there had been minimal compliance with the permanency plan as to Mother due to her health issues, and no compliance with the permanency plan as to Father. There had been no progress on the part of either parent toward alleviating the circumstances which had necessitated the original placement. At the May 20, 2020 hearing, the court found that the placement goal of return to parent was no longer feasible due to Mother's health condition and Father's incarceration. At that time the court ordered the new permanent placement goal to be adoption, with a concurrent goal of placement with a fit and willing relative.

The Minor Child was initially placed with the foster home from June 14, 2018 to July 20, 2018. From July 20, 2018 until February 22, 2019, the child was placed with a maternal great aunt and uncle. After February 22, 2019, the child returned to the original foster placement, where she has remained. The relative care resource requested the Minor Child be placed elsewhere due to behavioral issues that have not been observed since the child was returned to the foster placement. The Minor Child has bonded to the foster family and the foster parents desire to pursue adoption. She refers to the foster parents as "Mom" and "Dad." The foster family has adopted two other children fostered in the home during [Child]'s placement, and according to testimony, the Minor Child is eager for it to be "her turn."

Orphans' Court Opinion, 6/23/21, at 3-5 (record citations omitted, emphasis added).

CYS petitioned for involuntary termination of Mother and Father's parental rights on October 30, 2020. CYS alleged grounds for termination of Father's rights under 23 Pa.C.S.A. § 2511(a)(1), (2), and (8), and asserted termination would serve Child's needs and welfare as set forth in 23 Pa.C.S.A. § 2511(b). After two continuances, a hearing was conducted, in part by telephone, on May 11, 2021.[1] Child was represented by legal counsel Jeremy Wagner, and guardian ad litem Joshua Harshberger.

At the conclusion of the hearing, the orphans' court addressed Father, stating that the decision was one the court "did not take lightly." N.T., 5/11/21, at 100. The court advised Father, "as you said, you made some mistakes in your life. We can't go back, we can't change that, we can only go forward." *Id.* at 101. The court then verbalized its decision "based on everything I've heard here today and based on, you know, like I said mostly the fact that this little girl has been in placement for 35 months [and she] hasn't really had a relationship with her Dad." *Id.* at 104. The court continued, "this is a long time that [Child] has been in placement, and she

_____

[1] CYS requested both continuances so Mother's legal guardian could be present during the hearing. Mother has been legally incapacitated since February 18, 2020 and resides at a rehabilitation facility. N.T., 5/11/21, at 16-18. Through her guardian, Mother participated by telephone, but did not testify; Father testified by telephone from Florida.

needs some consistency for the rest of her life. Unfortunately, the best way I see to do that right now is to terminate parental rights." *Id.* at 102.

The court memorialized its decision by decree entered that same day.[2] On June 1, 2021, Father timely filed a notice of appeal and concise statement of errors complained of an appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court filed a Rule 1925(a) opinion on June 23, 2021.

Father presents three questions for review:

A. WHETHER THE TRIAL COURT COMMITTED AN ERROR OF LAW, AND/OR ABUSED ITS DISCRETION IN THE TERMINATION OF THE PARENTAL RIGHTS OF [A.C.C., JR.], BIOLOGICAL FATHER[?]

B. WHETHER THE TRIAL COURT COMMITTED AN ERROR OF LAW, AND/OR ABUSED ITS DISCRETION IN FINDING THE TERMINATION OF PARENTAL RIGHTS WERE PROPERLY TERMINATED UNDER 23 PA.C.S.A. §2511(A)(1) TO [D.C.], A MINOR CHILD[?]

C. WHETHER THE TRIAL COURT COMMITTED AN ERROR OF LAW AND/OR ABUSED ITS DISCRETION IN DETERMINING THAT PARENTAL RIGHTS SHOULD BE TERMINATED PURSUANT TO 23 PA.C.S.A. §2511(A)(8)[?]

Father's Brief at 4.[3]

---

[2] The court also terminated the parental rights of Mother, who did not appeal.

[3] Although Father presents three questions, he has not divided his argument into separate sections as required by Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein"). Father's noncompliance with Pa.R.A.P. 2119(a) does not impede our review.

We review a decision terminating parental rights for an abuse of discretion. This standard,

> requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

In addition, we recognize that termination involves a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). **see also In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).

As we need only agree with one subsection of Section 2511(a) to affirm, we focus on subsection (1), which provides for termination when:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused **or failed to perform parental duties**.

23 Pa.C.S.A. § 2511(a) (emphasis added).

Father argues he "did not evidence a settled purpose of relinquishing his parental claim to the Child." Father's Brief at 14. He asserts:

> Father has attempted to be a part of the child's life before, during, and after he was incarcerated. He attempted to have phone conversations with the Child, but was told by the Child's therapist that she did not believe such calls were in the child's best interest. During and after his incarceration, Father sent numerous letters and packages to the Child, as well as recordings of himself reading some books. He also attempted to reach out to the foster parents and the principal of the Child's school to find out how she was doing. Father even went so far as to offer his fiance as a resource for the Child, but she was rejected by CYS. He indicated that he would like the Child to live with him, that he would be able to care for her, and that he wanted to be a part of her life. As such, it is clear from Father's actions that he has not, by his conduct, evidenced a settled purpose of relinquishing his parental claim to Child, nor do the conditions which led to the removal or placement of the Child continue to exist.

> From the very start of this case, Father has maintained that he would not agree to any relinquishment his parental rights. At no time as he ever stated that he was willing to give up those rights. In fact, he has attempted to do everything in his power, even while incarcerated, to maintain his parental rights and create a bond with the Child. While there is no disagreement that Father has made some poor life choices, he never stopped loving the Child and wanting to be a part of her life. Even while he was incarcerated, he attempted to have phone contact with the Child. However, CYS never provided him with the necessary phone number to allow those calls to go through.

Father's Brief at 14-15 (footnote omitted).

CYS counters that termination was proper under Section 2511(a)(1). Citing applicable law, CYS asserts the testimony "made it clear that Father has done very little in terms of parental duties other than sending occasional letters." *Id.* at 12. CYS states:

> At the time of the hearing, the Minor Child had been in the care of the Agency for at almost thirty-five (35) months. During that time, Father was either on the run from law enforcement or incarcerated. He failed to perform parental duties and did not establish a bond with the child. Father was on the run from law enforcement at the outset of the case and eventually surrendered himself. He was released from incarceration a few weeks before the hearing to terminate parental rights. Father's relationship and contact with the child for the first eight years of her life was limited due to his own choices, being incarcerated for several years, and no bond existed between them by the time the Minor Child entered placement. The last time he saw her was during some visits to the county jail when she would have been five (5) years old at most. The Minor Child is steadfast in her unwillingness to attempt to form a bond with Father despite encouragement to do so from the Agency caseworkers and her foster parents.

CYS's Brief at 5-6.

Our review of the record reveals ample support for termination as summarized by CYS, as well as the orphans' court, which determined:

> Father has failed to meet the required standard of parental care because Father has failed to complete the required goals in the nearly thirty-five (35) months the child has been in care. Until CYS contact, Father had not been a presence in the Minor Child's life since birth, seeing her only a few times between 2010 and 2013. The Minor Child does not have a bond with him, and has consistently resisted the contact encouraged by CYS and the [pre-adoptive] foster parents.

Orphans' Court Opinion, 6/23/21, at 9.

Child's caseworker, CYS Supervisor Nicole Ruela, testified to being involved with Child's case since its inception. N.T., 5/11/21, at 5. Ms. Ruela stated that when Child first came into the care of CYS in June of 2018, Father testified at the emergency hearing by telephone, and "did not disclose an address," but stated "he was in the Pittsburgh area." *Id.* at 8. Father did not provide an address when he testified by telephone two months later at Child's dependency hearing. *Id.* at 10. Ms. Ruela testified Father "initially" had no contact with Child, but,

> then we arranged phone calls when [Child] was with the [foster placement] and he had sporadic phone contact with her. Shortly after, he had no contact with the Agency or with [Child] between the timeframes of August 6th of 2018 to March 4th of 2019 and then from March 4th of 2019 to October 27th of 2019.

*Id.* at 11. Ms. Ruela stated Father "was on the run from the police," but surrendered on March 24, 2019. *Id.* at 13. She described Father's contact with CYS as "sporadic"; at times Ms. Ruela was unable to reach Father, and/or he was incarcerated. *Id.* at 29. She also described Father's contact with Child as "sporadic." *Id.* at 31. Father was released from prison in Pennsylvania on March 20, 2021, and relocated to Florida where he was living at the time of the termination hearing on May 11, 2021. *Id.* at 29, 32.

At the time of Child's goal change hearing on May 21, 2020, Ms. Ruela obtained a written recommendation from Child's therapist, Olivia Guilbert, who met with Child weekly. *Id.* at 45, 93. The recommendation was entered

into evidence at the termination hearing without objection as Exhibit 3. ***Id.***

at 21. It stated that Child showed:

> no interest in reading [Father's] letters. I believe her age is a big factor here along with the understanding of the situation, I do believe that when she is a little older and more settled she will hopefully be in a better place to accept calls from him.

***Id.*** 20.

> Ms. Ruela testified:

> When we would go to the home, myself, the previous two caseworkers we would encourage her to write letters back. She would refuse. She often times didn't even want to read the letters. So the foster parent has kept the letters in a box for her to read when she's older.

***Id.*** at 32-33.

Ms. Ruela opined that Father has not availed himself of "opportunities to have a place in [Child's] life." ***Id.*** at 35. She also opined that Child has no bond with Father. ***Id.*** at 38. Child is doing "very well" in her current placement and wants to be adopted. ***Id.*** at 38-39.

Child's pre-adoptive mother testified to encouraging Child to read Father's letters, but Child "is not interested in them." ***Id.*** at 53. She testified Child "has really grown," "is loved by our extended family," and she "can't imagine our family without" Child. ***Id.*** at 54. She also stated that she would encourage Child to have contact with Father "if that's what [Child] wants." ***Id.*** at 59.

Father testified he last saw Child in 2013 and last spoke with her by telephone in 2019. ***Id.*** at 65. He stated that when he was incarcerated, he

- 9 -

"didn't put [Child] on the [telephone] list because I needed somebody to accept my call." *Id.* at 66. However, he also testified he did not have any visits in-person with Child while she was in the care of CYS because he was incarcerated "for about 2 years of the time that she was in care" and prior to his incarceration, when Child initially came into care in 2018, Father was "fleeing from the police on an active warrant." *Id.* at 85. Father stated he "made poor decisions in life but I'm not a bad guy." *Id.* at 71. He repeated: "I'm not a bad guy. I made poor choices." *Id.* at 75. He expressed:

> I would love to have my daughter and work on a relationship, build a life for her. But it seems like that's not in the cards as CYS is and everyone else is making it impossible for me to do so. You know it seems like they're putting their best foot forward for the Mom and I got it. I get it, her Mom is all she knows. But I just feel like they could do a better job encouraging a relationship with me, with her Father.
>
> Like I said I love my daughter. I've never stopped thinking about my daughter. Like I said I just made poor choices in life with myself. But I feel like they can do a better job encouraging my daughter to read my letters, accept my phone calls.

*Id.* at 71.

With regard to living in Florida, Father explained:

> They stated when I got released I didn't bother to see my daughter. I couldn't, I was released and had to immediately report to Florida. I couldn't just stay in Pennsylvania. I could not do that. It was impossible unless you want me to go back to prison. But that would be another poor choice I would have made.

*Id.* at 73.

Finally, Father testified he was "agreeable to [Child's] adoption as long as [he] can get updates" and "some kind of contact" with Child. *Id.* at 79.

After hearing the evidence, the orphans' court commented:

[Father] hasn't seen [Child] since 20[1]3. I got a child whose mother is dying. I got no relationship with the father who's in the State of Florida because that's where he's had to parole to and he had 24 hours to get there.

He wants to act like, you know, everybody is against him. I can't help that. But I can point out the fact that since 20[1]3 he has not seen his child enough to have a bond with her. At some point in time--at some point in time those letters that he wrote to her she's going to open and read them. At that point in time, she may want to reach out to him. The only thing I can say to him is if he wants to have a relationship with her, he should send a letter to us every month saying this is where I live. This is, you know, my phone number. This is what I'm thinking about. ... And then have us send it to the folks at the--at the foster care--foster home, okay. Which would be her adoptive home if I terminate rights and she gets adopted, okay.

I don't know if he wants to go with that plan, but that's what I would suggest to him so that one day when she decides she wants to talk to her dad, she can pick up the phone and call her dad, okay. Now obviously if she's adopted, those folks are going to be her parents. But at some point in time they may be able to have a relationship with--she may be able to have a relationship with him. He may be able to have a relationship with her. But it takes a little bit of work, okay.

*Id.* at 83-85.

The court then concluded it was "satisfied as to the truth of the facts set forth in the Petition, and that the Petition should be granted." *Id.* at 104. Under Section 2511(a)(1), although "it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re D.J.S.,* 737 A.2d 283, 286 (Pa. Super. 1999) (citations omitted). The court must examine the individual

circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. *Id.* at 285.

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. Where a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

Incarceration does not relieve a parent of the obligation to perform parental duties, and an incarcerated parent must "utilize available resources to continue a relationship" with his child. *In re Adoption of S.P.*, 328, 47 A.3d 817, 828 (Pa. 2012). It is well settled that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *See, e.g., In re G.M.S.*, 193 A.3d 395, 402–03 (Pa. Super. 2018).

Consistent with the above legal authority, the orphans' court advised Father, "you've done some things, [but] there was a lot more you could have done … as far as being a dad." N.T., 5/11/21, at 101. The record supports the court's conclusion that Father's choices "caused him to relinquish parental claim" and fail to "perform parental duties." **See** 23 Pa.C.S.A. § 2511(a)(1).

With regard to Child's needs and welfare, Father has not raised a claim regarding Section 2511(b) in his concise statement or brief. As such, Father has waived any issue concerning Section 2511(b). **See In re M.Z.T.M.W.**, 163 A.3d 462, 466 (Pa. Super. 2017) ("issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived") (citation omitted)).

However, even if Father had raised a Section 2511(b) issue, it would lack merit. The testimony of Ms. Ruela and Child's pre-adoptive mother supports the court's conclusion that termination served Child's needs and welfare, and was in Child's best interests. N.T., 5/11/21, at 38-40, 53-54. The record also supports the court's conclusion that Child "does not have a bond" with Father, and "is bonded to her foster family," who "have the tools and skills necessary to help her continue to grow[.]" Orphans' Court Opinion, 6/23/21, at 9-10. Accordingly, the orphans' court did not abuse its discretion in terminating Father's parental rights.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/01/2021</u>