J-A28039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.N.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: N.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1945 EDA 2022 |

Appeal from the Decree Entered June 21, 2022
In the Court of Common Pleas of Carbon County
Orphans' Court at No(s):  21-9398

BEFORE:  PANELLA, P.J., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                **FILED FEBRUARY 3, 2023**

N.K. ("Mother") appeals from the decree granting the petition filed by B.C. ("Father"), to involuntarily terminate her parental rights to their nine-year-old daughter, A.N.C. ("Child").  We affirm.

The relevant facts and procedural history are as follows.  Mother gave birth to Child in December 2012.  Mother and Father, who never married, ceased living together approximately one and one-half years later.  ***See*** N.T., 12/3/21, at 146-50.  They informally agreed that Mother would have Child during the week and Father would have her on the weekends and at other times when Mother permitted.  ***See id***. at 146-47.  After two or three months, Mother did not permit Father to see Child and withheld Child for approximately six months.  ***See id***. at 147-48.  Father filed a custody petition in Lehigh County, where he and Mother both lived.  ***See id***. at 9, 148-50.  In February

2015, the custody court awarded Mother primary physical custody of Child.[1] *See id*. at 150.

In the following six years, Mother committed various crimes and served increasingly longer terms of incarceration including very short terms in 2015, 2016, and 2017, seventy-seven days in 2018, 158 days in 2019, and one and one-half years from April 2020 to October 2021.[2] *See id*. at 153-58. Mother served one-and-one-half years of incarceration in Lehigh County Jail from April to November 2020 and the remainder at SCI Muncy and remains on parole until 2025. *See* N.T., 2/3/22, at 288-89, 296, 300.[3]

In February 2018, the custody court awarded Father primary physical custody of Child. *See id*. at 10, 156. In February 2020, the custody court awarded Father sole legal custody of Child, and awarded Mother and her

_____

[1] The certified record does not disclose how much custodial time the court awarded to Father.

[2] Mother received the final sentence for a conviction of aggravated assault with a deadly weapon which she testified occurred when while high on methamphetamine, she accidentally shot her boyfriend in the face with a gun she did not know to be loaded. *See* N.T., 2/3/22, at 298-99, 352.

[3] The transcript, numbered consecutively, contains the testimony from all three days of hearings conducted on the petition.

mother, Betty Schlicher ("Maternal Grandmother")[4] shared periods of partial physical custody ("the custody order"). *See id*. at 10-11.[5]

Father, his wife, C.C. ("Stepmother"), their two sons, and Child moved to Carbon County in 2020. *See* N.T., 12/3/21, at 5. Father filed a petition to involuntarily terminate Mother's parental rights in Lehigh County. Mother filed a petition for contempt and a petition for modification of the existing custody order and participated via telephone in a custody conference. *See* N.T., 2/3/22, at 315, 317-318. Father later withdrew the petition for undisclosed reasons after presenting some testimony. *See* N.T., 12/3/21, at 23-25, 186. After Father withdrew his petition, Mother failed to appear for a pre-trial conference and the court dismissed her petitions. *See* N.T., 12/3/21, at 27; N.T. 2/3/22, at 319, 325-26. In August 2021, Father filed a petition to involuntary terminate Mother's parental rights (the "involuntary termination petition") in Carbon County pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (2), and also declared Stepmother's consent to accept custody pursuant to 23 Pa.C.S.A. § 2711(a)(2). The Orphans' Court, upon Father's motion, appointed

---

[4] Maternal Grandmother had intervened in the custody matter during Mother's incarceration. *See* N.T., 12/3/21, at 8-9.

[5] Although the Orphans' Court from whose decree Mother appeals admitted the custody order into evidence, *see* N.T., 2/3/21, at 235-36, the certified record on appeal does not contain that order.

- 3 -

Child counsel, who acted as Child's *guardian ad litem* ("GAL"). Mother retained private counsel.

The Orphans' Court began hearings on the involuntary termination petition in December 2021. Father testified that Mother last had a scheduled visit with Child in February 2020. *See* N.T., 12/3/21, at 13. He testified that he brought Child to a scheduled visit two days later but took her away after he saw Mother's Facebook post seeking synthetic marijuana and observed that she appeared to be under the influence of drugs. *See id*. at 17-18, 128, 134. Father ceased permitting Mother to visit Child,[6] and filed a contempt petition less than one week later. *See id*. at 21-22, 89-92. Father testified that he did not receive screening results for Mother's drug and alcohol use as the custody order required, and believed Mother continued to use drugs. *See id*. at 21-22. Approximately one month later after Mother's incarceration, Father voluntarily withdrew his contempt petition. *See id*. at 22.

_____

[6] It is unclear whether Father's action violated the custody order. Paragraph 3 of the custody order, parts of which the Orphans' Court read into the record, granted Mother visits with Child every Tuesday and Thursday and alternate weekend visits. *See* N.T., 12/3/21, at 136-39. However, paragraph 5 permitted Father to cancel a visit if Mother appeared to be under the influence of drugs or alcohol. *See id*. at 134. Additionally, paragraph 9 made Mother's partial physical custody contingent upon her full compliance with her parole and probation requirements and required her to obtain and have sent to Father two reports in February and March 2020 demonstrating her compliance with mental health and drug and alcohol evaluations. *See id*. at 24, 141-46, 173-78. Father testified he did not receive those reports. *See id*. at 173-78.

Father testified that Mother called to speak to Child about sixteen times between April 2020 and December 2020 and did not call thereafter. ***See id***. at 100, 103-106. Father stated that he answered two of those calls and that the other calls came outside the time the custody order permitted Mother to call,[7] including once when Mother called at 9:00 p.m. on Child's birthday, or when he found himself busy at work. ***See id***. at 46-50, 102-05. Father also testified that prior to his filing the petition for involuntary termination, Mother last spoke by phone with Child on Child's birthday in December 2020. ***See id***. at 51. Father testified that in the eight months from December 2020 to the filing of the involuntary termination petition, Mother sent two postcards and two letters to Child, but did not send a birthday present, Christmas card, or Christmas present, or toys or clothing. ***See id***. at 59, 66-67, 132-33. Father testified that he has always been Child's sole financial support. ***See id***. at 63. He testified that Child's art never depicts Mother, and that Mother never requested a photograph of Child. ***See id***. at 68-69.[8]

_____

[7] Father testified that Paragraph 8 of the custody order permits Mother to call Child on Mondays, Wednesdays, and Fridays between 4:00 p.m. and 5:00 p.m. ***See*** N.T., 12/3/21, at 46.

[8] Stepmother also testified that Mother had not attempted to contact her either in the more than one year between the beginning of Mother's most recent incarceration and the filing of the involuntary termination petition, and that she did not contact Mother. ***See*** N.T., 12/3/21, at 194, 197, 200-01. She also testified about a brief visit Mother paid to Child's home in October 2021, during which Child told Mother that she did not want to see her, and two telephone calls Mother made to Child in November and December 2021, both
*(Footnote Continued Next Page)*

On cross-examination, Father admitted that the custody order required him to inform Mother of all decisions concerning Child's health care and education by text message, email, or first-class mail, and that he had made no such communications from February 2020 until he filed the involuntary termination petition. *See id*. at 81-82, 94-95. Father also stated that he had not sent Mother any of Child's art, report cards, doctor's exams, or photographs during Mother's incarceration, and did not take Child to the prison to see Mother. *See id*. at 107-09. Father testified that Child does not want to speak to Mother although he encouraged her to do so. *See id*. at 110, 113.

The hearing had not concluded at the end of the day's testimony, and the Orphans' Court scheduled a second day of hearings. *See id*. at 180. The day before the scheduled second hearing, Mother's counsel requested a continuance asserting that Mother did not have transportation to court. The Orphans' Court denied the continuance but permitted Mother to attend the hearing *via* Zoom. *See* N.T., 2/3/22, at 181-183. Mother overslept and, when she contacted the court in the afternoon from a cell phone in a friend's car, she did not have the Zoom link. She testified *via* telephone. *See* N.T. 2/3/22, at 183-85, 272-77, 330-32.[9]

---

of which led to Child crying and saying that she did not want to see Mother. *See id*. at 203-08, 216-20, 222.

[9] Mother also failed to appear in person at the third day of hearings. She asserted that she had not received notice of that hearing. *See* N.T., 2/15/22, at 343.

While waiting to hear from Mother, the Orphans' Court interviewed Child *in camera* under oath in the presence of the parties' counsel. Child testified that she fears Mother. *See id*. at 256. Child stated that she refers to Mother by her first name, and calls Stepmother "Mom." *See id*. at 244-245.[10] Child told the court that Mother had been physically violent with her and others, and she does not want to see Mother again. *See id.* at 250-55, 260, 263-64.

Mother testified that she made numerous attempts to call Child in December 2020 and January 2021, sent her a Valentine's Day card in February 2021, and sent five additional pieces of mail to Child prior to her release from prison in October 2021. *See id*. at 290-94. She also testified that she called to speak to Child over 100 times between April and November 2020. *See id*. at 296. Mother denied Child's report that she had punched a friend named Jenn in the nose. When Father's counsel played a video of Mother punching someone in the nose, Mother admitted punching the person but identified her as Heather. *See* N.T., 2/15/22, at 357-58. Mother also testified that she had missed mandatory drug screenings since her release from prison. *See id*. at 369-70.

After the end of the hearings, the GAL and Father submitted separate proposed findings of fact and conclusions of law in support of involuntary

---

[10] Father had previously testified that Mother became enraged on a visit with Child when Child referred to Stepmother as "Mom." *See* N.T. 12/3/21, at 160-62.

termination. Mother did not submit proposed findings. The Orphans' Court issued a decree involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), and (b), and filed a memorandum opinion ("Memorandum").

Mother filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The Orphans' Court filed a Rule 1925(a) opinion, briefly addressing Mother's alleged error and referring this Court to its Memorandum to explain its denial of Mother's appellate claim.

On appeal, Mother presents the following issue for review:

> Did the trial court err as a matter of law and/or abuse its discretion by finding clear and convincing evidence of abandonment by [Mother] of her parental duties under 23 Pa.C.S.A. [s]ection 2511(a)(1) in that the trial court failed: (1) to properly credit repeated attempts by [Mother] at continued contact with [Child]; (2) to adequately consider the limitations placed upon [Mother] by [SCI] Muncy; and (3) to properly acknowledge repeated violations by [Father] of the existing child custody order and interference with attempts by [Mother] at continued contact with [Child]?

Mother's Brief at 5 (full capitalization omitted).[11]

---

[11] While Mother's argument section alludes to an argument regarding the best interests of the child, 23 Pa.C.S.A. § 2511(b), **see** Mother's Brief at 13-14, 28-29, she did not preserve the issue in her concise statement or in her statement of questions involved. Mother thereby waived her claim. **See In re M.Z.T.M.W.**, 163 A.3d 462, 466 n.3 (Pa. Super. 2017) (finding that a party waives a claim by failing to assert it in a concise statement or statement of questions involved).

An appellate court reviews an involuntary termination order for an abuse of discretion, which limits its review to a determination of whether competent evidence supports the termination court's decree. *See In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). An appellate court must accept the Orphans' Court's findings of fact and credibility determinations which the record supports. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). Where the record supports the Orphans' Court's factual findings, an appellate court may not disturb that court's ruling absent an error of law or abuse of discretion. *See In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion exists where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *See id*.

Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2511, governs the involuntary termination of parental rights. If the Orphans' Court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, then it must assess the petition under section 2511(b), which focuses on the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In this case, the Orphans' Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of

the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * * * *

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1) . . . the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

Concerning proof of subsection 2511(a)(1), this Court has stated:

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

[s]ection 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. ***Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.***

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b).

- 10 -

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted) (emphasis added). Clear and convincing evidence is that which is so clear, direct, weighty and convincing as to allow the trier of fact to reach a clear conviction, without hesitance, of the truth of the precise facts in issue. *See In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000).

The Orphans' Court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions. *See In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999); *see also In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (stating that the Orphans' Court must consider the explanations offered by the parent facing termination of parental rights, to determine if the evidence clearly warrants the involuntary termination). With regard to post-abandonment conduct:

> to be legally significant, [it] . . . must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish h[er] parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (internal citation omitted).

Regarding the definition of "parental duties," this Court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

- 11 -

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

***Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.*** A parent must utilize all available resources to preserve the parental relationship[] and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d at 855 (internal citations and quotations omitted) (emphasis added). Critically, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must utilize available resources to continue a relationship with his or her child. ***See In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012). ***See also In re Adoption of McCray***, 331 A.2d 652, 655 (Pa. 1975) (stating that when a parent does not exercise reasonable firmness in declining to yield to obstacles during incarceration, her parental rights may be forfeited).

In her issue on appeal, Mother asserts that the Orphans' Court failed properly to weigh the evidence. She asserts that Father thwarted all her efforts to remain in touch with Child by telephone, the means available to her

to contact Child while in prison. *See* Mother's Brief at 26-28. Mother contends that she called in excess of fifty times to speak with Child, but only spoke to her twice. *See id*. at 19-20. Mother argues that Father did not contradict this assertion and that the record shows that Father prohibited contact between Mother and Child. *See id*. at 20. She asserts that the Orphans' Court unfairly faulted her for not sending cards and letters to Child she might not have had the money to pay for and asserts that the court failed to consider that she may not have wanted Child to experience a prison visit. *See id*. at 20. Mother also asserts that the court should have considered her failure to request information about Child in light of Father's failure to provide that information or answer her phone calls, and further assails Father's explanation of his reasons for not answering the vast majority of her calls. *See id*. at 21-23. Finally, Mother asserts that the Orphans' Court should not have focused exclusively on her conduct in the six months immediately preceding the filing of Father's petition and cites her attempts to call Child prior to those six months and her post-petition attempts to see Child in November and December 2021. *See id*. at 24-26.

The Orphans' Court credited Father's testimony that Mother had called only sixteen times between April and December 2020, all but twice outside of the times the custody order permitted her to call. *See* Memorandum, 6/21/22, at 7-8. The Orphans' Court also found that with the exception of two postcards, Mother sent no cards, letters, or gifts to Child, or asked Father

for photographs of Child or inquired about Child's health or schooling or request a prison visit; nor did Mother buy clothing or gifts for Child any time after February 2018. ***See id***. at 8-9.

In the Orphans' Court's opinion, Mother's incarceration and Father's impeding behavior made it more difficult for Mother to be in touch with Child. ***See id***. at 9. The Orphans' Court found that Mother did not exercise reasonable firmness to overcome those obstacles, and Father's conduct did not constitute a substantial factor in her lack of contact with, or support of, Child. ***See id***. at 10. The Orphans' Court explained:

> Mother's confinement did not prohibit her from making phone calls to [Child] during the times allotted in the existing [c]ustody [o]rder or from sending cards or letters from prison. It did not prohibit her from making contact with Father or Stepmother to obtain pictures of [Child] or inquiring about [Child's] health or progress in school. And while Mother contends Father himself was a barrier to these means of maintaining a relationship, prompting Mother to file a [p]etition for [c]ontempt of the [c]ustody [o]rder . . . and [m]odification of the [c]ustody [o]rder . . . Mother did not actively participate in or pursue these proceedings. Both petitions were denied . . . for Mother's failure to appear at a custody conference . . . after due notice, and for which she failed to make arrangements to remotely attend, a procedure with which she was familiar.

***Id***. at 10-11 (footnote omitted). The Orphans' Court also found Mother's failure to attend in person the hearings on the involuntary termination petition to be indicative of her lack of clear desire to be involved in Child's life. ***See***

- 14 -

*id*. at 3 n.2.[12]  Finally, Mother never testified that she loved Child.  ***See id***. at 10-12.

The Orphans' Court noted that Mother had attempted to see Child in October 2021 and had called her one time each in November and December 2021, and that on all three of those occasions, Child did not want to have contact with Mother.  ***See id***. at 9.  The court found that Mother's post-abandonment and post-petition conduct did not demonstrate a continuing interest in Child or a genuine effort to maintain communication and association.  ***See id***. at 12.[13]

After careful review, we conclude that the record supports the Orphans' Court's findings of fact and conclusion of law and that the court did not abuse its discretion in its weighing the evidence and granting Father's involuntary

---

[12] The Orphans' Court did not find persuasive Mother's assertion of not being at fault for missing the pre-trial conference for the Lehigh County custody case.  ***See*** N.T., 2/3/22, at 329.  Mother testified that she participated virtually at a custody conference just two months before the pre-trial conference.  ***See id***. at 317-318.  Accordingly, the Orphans' Court concluded that Mother failed to obtain the accommodations for the pre-trial conference she had previously secured for the custody conference.  ***See*** Memorandum, 6/21/22, at 10-11.

[13] Although the Orphans' Court found that Father had proved the application of section 2511(a)(1) by clear and convincing evidence, it found that Father had not proved the application of section 2511(a)(2) because "no evidence of record suggests that [Child] while in the care of Father and Stepmother has been without essential parental care, control or subsistence, or that her needs and welfare have not been met."  ***See*** Memorandum, 6/21/22, at 15. ***See In re Adoption of L.A.K.***, 265 A.3d at 600 (finding that children, in the care of mother and stepfather, were not without essential parental care, control, or subsistence).

termination petition. The record supports the Orphans' Court's finding that Mother made only sixteen calls to Child during her imprisonment and that the majority of those calls occurred outside the time the custody order permitted. *See* N.T. 12/3/22, 100, 103-06 (Father's testimony that Mother called around sixteen times from April 2020 until December 2020; that fourteen of those calls occurred at times not permitted by the Custody Order). Father's testimony, which the Orphans' Court credited, also established that Mother only sent Child two postcards and two letters while incarcerated, did not ask for pictures of Child or inquire about Child's health or schooling or request a contact visit, and that since February 2018, Mother has not purchased any clothing or gifts for Child, and she does not provide any financial support for Child. *See id*. at 43-44, 59-69, 109, 113, 132-33. Moreover, Mother did not pursue her contempt or custody petitions, did not request that Child visit her, and did not provide financial support for Child.[14]

_____

[14] Mother contends on appeal that she might not have had the money to send letters or postcards and might not have wanted Child to have the unsettling experience visiting her in prison. Mother gave no such testimony below. We decline to find that the Orphans' Court abused its discretion by failing to weigh evidence Mother did not present.

Mother also faults the court for allegedly not considering any times other than the six months prior to the filing of the involuntary termination petition. A review of the Orphans' Court's Memorandum shows that although it used the date of the termination petition as the "focal point" for its analysis, it considered events both before and after that time period. *See* Memorandum, 6/21/22, at 7-12 and n.8 ("Mother acknowledged and the record confirms that she has not played a substantive role in [Child's] educational or medical life in the last three years").

The Orphans' Court acknowledged that Mother made efforts to contact Child after Father served the involuntary termination petition on her in September 2021. Although it expressed uncertainty that the law requires a court that has found abandonment pursuant to Section 2511(a)(1) to consider a parent's post-petition conduct, *see* Memorandum 6/21/22, at 6-7 n.5 (citing *In re C.M.*, 255 A.3d at 366-67), the court nevertheless considered Mother's post-petition conduct of appearing twice at Father's house and calling to speak to Child, *see* N.T., 2/3/22, at 284-90, and found that she failed to meet her burden to prove either "a continuing interest in [Child] or a genuine effort to maintain communication and association with her"). *See* Memorandum, 6/21/22, at 12.

The record supports the Orphans' Court's determination that Mother failed to perform her parental duties in excess of the six months prior to the filing of the August 2021 termination petition, notwithstanding the impediments her imprisonment and Father's limited cooperation represented. *See In re S.P.*, 47 A.3d at 828. The record also supports the Orphans' Court's finding that Mother failed to demonstrate legally significant post-abandonment contact because that conduct failed to be "steady and consistent over a period of time, contribute to the psychological health of the child . . . and [to] demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship . . . and a willingness and capacity to undertake the parental role." *Z.P.*, 994 A.2d at 1119. Because we discern no error of law or abuse

of discretion, Mother has failed to present a basis for us to disturb the Orphans' Court's finding of grounds for termination pursuant to Section 2511(a)(1).[15]

Based on the foregoing, we affirm the decree involuntarily terminating Mother's parental rights.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/3/2023

---

[15] As noted, Mother failed to preserve a section 2511(b) claim. Even if she had, it would be meritless. A section 2511(b) analysis focuses on the developmental, physical, and emotional needs and welfare of the child, *see* 23 Pa.C.S.A. § 2511(b), including "[i]ntangibles such as love, comfort, security, and stability," *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012), and a consideration of the parent-child bond. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Relying on testimony that Child regards and refers to Stepmother as her mother and does not want to see or speak with Mother, whom she fears, the Orphans' Court found no bond between Mother and Child and, moreover, no bond that if severed would destroy any existing, meaningful, or beneficial relationship or cause emotional harm to Child. *See* Memorandum at 13-14. The record evidence supports the Orphans' Court's finding, and we would have no basis to disturb that determination.