J-A04015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.Q.T., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.M.B., MOTHER | : : : : : : : | |
| | : | No. 1242 MDA 2024 |

Appeal from the Decree Entered August 2, 2024
In the Court of Common Pleas of Clinton County Orphans' Court at
No(s):  2024-00001

BEFORE:  LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, P.J.:                **FILED: FEBRUARY 14, 2025**

L.M.B. ("Mother") appeals from the decree, entered in the Court of Common Pleas of Clinton County, Orphans' Court Division, involuntarily terminating her parental rights to her daughter, A.Q.T. ("Child") (born September 2014).  After our review, we affirm.

On January 16, 2024, D.T. ("Father") and T.T. ("Stepmother") filed a petition seeking the involuntary termination of Mother's parental rights to Child.[1]  **See** 23 Pa.C.S.A. § 2512(a)(1) (termination petition may be filed by either parent when termination is sought with respect to other parent).  The petition averred that Child has resided with Father since birth, and currently resides with Father and Stepmother.

---

[1] Simultaneously therewith, Father and Stepmother filed a petition to allow Stepmother to adopt Child.

On January 22, 2024, the Orphans' Court appointed Timothy Reitz, Esquire, as legal counsel for Child.  **See** 23 Pa.C.S.A. § 2313(a) (court shall appoint counsel for child when termination contested by one or both parents). By decree dated March 4, 2024, the court appointed Stephanie L. Cooper, Esquire, as guardian *ad litem* ("GAL") to represent Child's best interests.  **See id.** (court may appoint GAL to represent minor child when it is in child's best interests to do so).  The court held a termination hearing on June 10, 2024, at which time Father, Stepmother, Mother, Maternal Grandmother, Stacey Gallagher (Mother's former neighbor), and Attorney Cooper testified.

At the hearing, Stepmother testified that she and Father have been married since May 2023 and have lived together since May 2021.  **See** N.T. Termination Hearing, 6/10/24, at 17.  Stepmother testified that Mother had been regularly involved in Child's life until approximately spring of 2023.  **Id.** at 17-18.  Stepmother stated that Mother's last in-person contact with Child was in September 2023.  **Id.** at 18.  Between June 19, 2023 and September 2023, Mother had no contact with Child other than "a phone call here or there." **Id.**  Stepmother testified that, since September 2023, Mother had no contact with Child "[o]ther than random phone call[s]."  **Id.** at 19; **id.** at 21 (Stepmother estimating Child received "[m]aybe one or two" calls from Mother between September 2023 and end of 2023).  Stepmother testified that Mother called Child on Christmas and, once Mother left rehab in February, she would call "maybe once a week."  **Id.**  At the time of the hearing, Child had not heard from Mother since mid-April.  **Id.**  Stepmother testified that Mother had not

performed any parental duties, such as taking Child to doctor's appointments, being involved in Child's schooling, or providing financial assistance, since June 2023. *Id.* at 19-20, 22, 26. Mother did not send Child a birthday card or gift for her September 2023 birthday and failed to call Child on any other holiday, such as Easter or Thanksgiving. *Id.* at 23. Stepmother testified that, at this point, when asked if she would like to call Mother, Child says "no." *Id.* at 25. Finally, Stepmother testified that she has a good relationship with Child, views Child as a daughter, and believes it would be in Child's best interests to be adopted by Stepmother. *Id.* at 20.

Father similarly testified that, for "a long time," Mother has not been involved in Child's schooling or medical care or provided any financial support to Child. *Id.* at 28. Father testified that, since the filing of the termination petition, there had been a slight increase in Mother's attempts to contact Child, such as "a couple more random phone calls but nothing solid . . . believing that she was going to try." *Id.* at 29. Father testified that he had provided Mother with dates and times for Child's softball games, but Mother never attended. *Id.* at 31-32. On cross-examination, Father conceded that he has instructed Maternal Grandmother not to discuss Mother during her weekly phone calls with Child. *Id.* at 30. Father explained that "it was mentally—when I bring up [Mother] to [Child] she would get very stressed and very quiet and go to her room and wouldn't want to talk on the phone. I said the conversation between [Maternal Grandmother] and [Child] should be between [the two of] them[.]" *Id.* at 31. Father testified that Child's current outlook

is "[h]appy[-]go[-]lucky" and that she has not asked about Mother in the previous four or five months. *Id.* at 71. Father opined that it would be in Child's best interests to be adopted by Stepmother and that, when Mother had custody, Child did not feel safe. *Id.* at 71-72. Father testified:

> [When he and Stepmother were on their] honeymoon [in 2023, he] had to take care of what was going on here continuously for [Child] when [Mother] was not around. Where she was at, [he did] not know. [He has] dealt with this now for a year, and [he] can't keep doing it any more. It's hard on [Child]. She doesn't deserve it. [He] got her right where she wants to be. And [he's] not going backwards [any] more. [He's] going forward.

*Id.* at 73.

Stacey Gallagher, Mother's neighbor from 2021 to 2023, testified on Mother's behalf. Gallagher stated that she took Mother to visit Child prior to Mother entering rehab in July 2023. *Id.* at 34. She stated that they "were there for about 10 minutes, and then we left." *Id.* Gallagher further testified that, when Mother was her neighbor, Child spent a lot of time at her house. *Id.* at 35. She stated Child would "play with [her] kids. Sometimes she didn't want to be down at the house with [Mother]. Sometimes she just would cry if she had to go home" to Mother. *Id.* at 35-36. Gallagher also testified that she often had to pick Child up from the school bus because Mother was not there to get her. *Id.* at 37.

Maternal Grandmother also testified on Mother's behalf. She stated that she has a very strong bond with Child and she has "always been there" for Child. *Id.* at 42-43. She testified that she speaks to Child "at least every Sunday" and sometimes more than that. *Id.* at 43. Maternal Grandmother

stated that she "was given a written letter that asked [her] not [to] talk about [Mother] at all in [Child's] presence." *Id.* at 45. She testified that Mother asks about Child and has been "very distraught about the fact she hasn't been able to see [Child] at all during this whole time." *Id.* at 46. Maternal Grandmother stated that she had been supportive of Father seeking full custody of Child to give Mother time to turn her life around, but she also had asked him "not to hold that over [Mother] . . . when she comes back and gets things together to allow her to do that[.]" *Id.* at 49-50.

Mother testified that she had been in jail between October 18, 2023 and December 12, 2023, and then in rehab between December 12, 2023 and February 8, 2024. *Id.* at 57. She stated that she currently lives in a trailer park, has not had a job since 2021 or 2022, and does not own a vehicle. *Id.* at 59-60, 68. Mother testified that she believed that she and Child "got along good [sic]" when Child was with her. *Id.* at 61. Mother stated that, at some point, it became difficult for her to contact Child because she did not have a phone. *Id.* She also claimed that Father and Stepmother "would always be next to [Child] when we were trying to have a conversation" and that they would "jump in" to the conversation, which would distract Child, who has ADHD. *Id.* at 62. Mother testified that she still would like to be a mother to Child and that she is capable of acting in that role but "just need[s] to get a job and a counselor." *Id.* at 62-63.

Finally, Attorney Cooper, Child's GAL, testified that, in her opinion, Mother is not capable of providing the stability and security that Child needs.

*Id.* at 76. However, Attorney Cooper also believed that Mother and Child should continue to maintain some kind of contact. *Id.* Attorney Cooper testified that Stepmother provides the security and stability that Child craves, that Child "clearly loves her stepmom," and "it's obvious to me her stepmom loves her." *Id.* She opined:

> I think it would be in [Child's] best interest at this point for [Mother's] parental rights to be terminated and for [Stepmother] to adopt her, and for them to be a family unit, and for [Child] to have [] contact through a contract with [Mother]. I think that would [] meet all of [Child's] needs to be able to see and to love all of the people she sees and loves, but to be able to have the stability that she needs so that her grades can stay good[.]
>
> . . .
>
> [I]t's not fair to [Child] to wait until [Mother] gets herself together to be able to be her mom[,] especially when she has someone who is being her mom right now, and who is providing that—I know I keep coming back to those words, security and stability. But they are so important for children. And for [Child] to be able to have that and then to still have a relationship with [Mother]. And if [Mother] continues to grow and continues to be able to get herself together, which I hope she does, then their relationship can continue to grow as well.

*Id.* at 76-77.

At the close of the hearing, the Orphans' Court set a briefing schedule. Following receipt of the parties' submissions, on August 1, 2024, the court issued a decree terminating Mother's parental rights. On August 28, 2024, Mother filed a timely notice of appeal but failed to simultaneously file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, as required by Rule 1925(a)(2)(i). *See In re K.T.E.L.*, 983 A.2d 745 (Pa. Super.

2009) (failure of children's fast track appellant to file contemporaneous concise statement with notice of appeal results in defective notice of appeal, disposition of which to be decided on case-by-case basis). As a result of this defect, on August 29, 2024, the Orphans' Court entered an order directing Mother to file a Rule 1925(b) statement. However, the Orphans' Court failed to include in its Rule 1925(b) order "both the place the appellant can serve the [s]tatement in person and the address to which the appellant can mail the [s]tatement to the trial judge" as required by Rule 1925(b)(3)(iii).

Due to the breakdown in the Orphans' Court in failing to enter a compliant Rule 1925(b) order, on September 4, 2024, this Court entered an order directing Mother to file the Rule 1925(b) statement with the Orphans' Court, to serve a copy of the statement on the trial judge and all parties, and to send a copy to this Court no later September 16, 2024. On September 6, 2024, Mother filed her Rule 1925(b) statement with the Orphans' Court, raising to sole issue she now presents on appeal, to wit: "Whether the [Orphans' Court] erred as a matter of law by granting [] termination of Mother's parental rights pursuant to 23 Pa.C.S.[A. §] 2511(a)(1)?" Brief of Appellant, at 4.

The well-settled principles of appellate review of an Orphans' Court order are as follows:

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines

the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*In re A.J.B.*, 797 A.2d 264, 266 (Pa. Super. 2002).

In cases involving termination of parental rights, our scope of review is broad. All of the evidence, as well as the [Orphans' Court's] factual and legal determinations, are to be considered. However, our standard of review is limited to determining whether the order of the [Orphans' Court] is supported by competent evidence, and whether the [] court gave adequate consideration to the effect of such a decree on the welfare of the child. We have always been deferential to the [Orphans' Court] as the fact[-]finder, as the determiner of the credibility of witnesses, and as the sole and final arbiter of all conflicts in the evidence.

*In re S.D.T., Jr.*, 934 A.2d 703, 705–06 (Pa. Super. 2007) (citations omitted). The burden of proof in a termination case is on the petitioning party, who must establish valid grounds for termination by clear and convincing evidence. *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

Here, the court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), which provides that a parent's rights may be terminated where "[t]he parent[,] by conduct continuing for a period of at least six months immediately preceding the filing of the petition[,] either has evidenced a settled purpose of relinquishing claim to a child or has refused or failed to perform parental duties." *Id.* Section 2511(a)(1) "does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child **and** refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim

- 8 -

to a child **or** fails to perform parental duties." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (emphasis in original).

Mother argues that the Orphans' Court erred in terminating her rights because she has "made a genuine effort to communicate and continue an ongoing relationship with [] Child, despite the setbacks she was facing." Brief of Appellant, at 18. She asserts that she "made used of the resources she had available to her during her incarceration period and while in rehab," and it was not until she was released from jail that she could "fight to regain her custodial periods in a meaningful manner." ***Id.*** at 19. Mother cites ***In re: Adoption of A.C.***, 162 A.3d 1123 (Pa. Super. 2017), arguing that the case stands for the proposition that parental incapacity may be remedied through release from jail. ***Id.*** Mother is entitled to no relief.

Mother oversimplifies the Court's holding in ***A.C.*** There, the child was born in July 2014 and, due to mother's drug use, immediately and voluntarily placed into kinship care upon her release from the hospital. After some uncertainty over father's paternity, he was ultimately adjudicated child's father. Child was adjudicated dependent in September 2014; father did not attend the hearing, but it was unclear whether he had received notice of the proceeding. Between September 2014 and December 1, 2014, father attended 4 out of 30 visits with child but, again, it was uncertain whether father was given notice of the visits. From December 1, 2014 through March 2016, father was incarcerated. During that time, child visited with father in prison on a biweekly basis.

In September 2015, CYS filed a petition to terminate father's parental rights. The hearing was continued several times pending the outcome of his criminal trial. In March 2016, father was acquitted of his pending charges. At the termination hearing, a bonding assessment indicated that child and father were forming a bond. Since his release from jail, father had also been complying with all of the family service plan directives put in place by CYS.

The trial court denied CYS' termination petition and child appealed through her GAL. In affirming the trial court's order, this Court quoted the following findings of fact made by the trial court:

> [While] he was incarcerated, Father maintained regular biweekly visits with [Child]. He claims he was not initially offered these visits at the jail by CYS, but that he had to request them, and that they started as a result of his efforts. Father requested to have visits increased at the jail, but the request was denied. The court did not want to set precedent to allow weekly visits for some inmates, but bi-weekly visits for others, especially given Father's lack of involvement prior to incarceration
>
> . . .
>
> Father maintained contact and visits with [Child] throughout his incarceration. He sent letters to her caretakers and requested photographs.
>
> Since his release from jail, Father has complied with all of the CYS directives in the family service plan. He obtained a drug and alcohol evaluation, which indicated no further treatment was necessary. He obtained a parenting evaluation, which recommended no additional services. He attended the bonding assessment. He obtained adequate housing with his [m]other and his other children. He is in the process of reinstating his driver's license.
>
> He visits regularly with [Child], who calls him "daddy," and the visits go well.

- 10 -

*In re Adoption of A.C.*, 162 A.3d at 1130.

The Court agreed with the trial court that the situation in *A.C.* was "quite different" from the factual scenario in another case in which the imprisoned parent "did not take advantage of his visitation rights or his personal counselor nor did he make sincere or persistent efforts to locate or inquire about his daughter." *Id.* at 1131.

It is clear that *A.C.* does not stand for the proposition that parental incapacity may be remedied merely by being released from prison. Rather, a parent must take advantage of the resources available to her and make sincere and persistent efforts, despite being incarcerated, to further the parent/child relationship. *See id.*

> [I]ncarceration of a parent does not, in itself, provide sufficient grounds for termination of parental rights; however, an incarcerated parent's responsibilities are not tolled during his incarceration. *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999). Parental rights may not be preserved by waiting for some more suitable financial circumstance or convenient time for the performance of parental duties and responsibilities. *Id.* at 287. Further, parental duty requires that the parent not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. *Id.* (quoting *In re Dale A., II*, [] 683 A.2d 297, 302 ([Pa. Super.] 1996)).

*In re C.S.*, 761 A.2d at 1201.

Here, petitioners presented clear and convincing evidence that Mother refused or failed to perform parental duties for the six months preceding the filing of the termination petition. *See* 23 Pa.C.S.A. § 2511(a)(1). Aside from a few sporadic phone calls, a brief visit in July 2023, and another visit in

September 2023—which Mother did not even remember[2]—Mother has failed to perform any parental duties whatsoever since June 2023. There was no evidence presented that Mother made any effort—other than a single phone call on Christmas—to contact Child while she was incarcerated or in rehab. While we are sympathetic to Mother's recent attempts to turn her life around, Child's life "simply cannot be put on hold in the hope that [Mother] will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [her] physical and emotional needs." *In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010).

In light of the foregoing, we conclude that the Orphans' Court did not abuse its discretion or err as a matter of law in terminating Mother's parental rights.

Decree affirmed.

---

[2] Stepmother testified that Mother's last visit with Child was in September 2023. When Mother was asked about the last time she saw Child, she testified that it had been in July 2023. The court then followed up:

> THE COURT: [W]e heard that Ms. Gallagher took you to petitioners' home at some point in July for a couple minutes, like 10 minutes[,] before you went to rehab. And then we also heard that you spent two hours in September with [Child]. You don't recall the September meeting with her?
>
> [MOTHER]: No, I don't.

N.T. Termination Hearing, 6/10/24, at 64-65.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/14/2025